## Richmond

### ELLA MAE PURCELL, INDIVIDUALLY, ET AL. V. MARY WASHINGTON HOSPITAL ASSOCIATION, INCORPORATED.

March 4, 1977.

Record No. 760225.

Present, All the Justices.

*Charles O. Cake (Howard, Stevens, Lynch, Cake & Howard, P..C., on brief), for plaintiffs in error.*

*R. Carter Scott, III (Richard K. Bennett; Browder, Russell, Little, Morris & Butcher, on brief), for defendant in error.*

HARMAN, J., delivered the opinion of the court.

This is a consolidated appeal in three separate actions brought by Ella Mae Purcell, individually and as mother and next friend of Santo Devon Purcell and Lashavon L. Purcell, infants (plaintiffs), against Mary Washington Hospital Association, Incorporated (the hospital), and two of its staff physicians for negligence which is alleged to have occurred in April, 1971. The trial court, after a consolidated hearing *ore tenus* on the hospital's pleas of charitable immunity [1], sustained the pleas and dismissed the hospital as a party defendant in each action. We

---

[1] The charitable immunity of most hospitals has been prospectively eliminated or restricted by Acts 1974, c. 552 and Acts 1976, c. 765. Code § 8-629.2 (Cum. Supp., 1976).

granted a writ of error to the orders sustaining the pleas to determine whether the trial court erred in this ruling.

The evidence discloses that the hospital was chartered under § 1145 of the 1887 Code [2] by an order of court on February 28, 1903. This charter was subsequently amended on January 21, 1919, by an order of the State Corporation Commission.

The 1919 charter amendments set forth the following as the objects and purposes of the corporation:

> "3. The purposes for which it is formed are to conduct and run a general hospital for the treatment of the sick and to conduct, maintain and run a training school and home for trained nurses in connection therewith, and to issue to graduate nurses from such school, diplomas and other evidences of proficiency as such."

The hospital discontinued its nursing school in 1929 but it makes its facilities available, without charge, to the nursing program taught by the area community college and a "local program" to train licensed practical nurses.

Section 5 of the original charter provided for the issuance of not less than $100 nor more than $500 in capital stock of the corporation "divided into shares of such denominations as the association shall direct." Section 5 further provides "[n]o dividends shall be declared on said stock but all receipts from all sources shall be a fund exclusively for the benefit of said hospital and for its purposes as in this charter set forth." While the testimony discloses that no shares of stock are outstanding, the amendments did not refer to or purport to amend Section 5 of the original charter. For many years, probably since the 1919 amendments, the corporation has filed an annual report as a nonstock corporation with the State Corporation Commission.

The only limitations in the hospital's charter are in its purposes and the provision set forth above prohibiting dividends. While the court order chartering the hospital recited that the corporation was "purely benevolent and charitable and no fee is required", nothing contained in the charter, as amended, limits, restricts or requires the hospital to conduct its affairs as a religious, benevolent, charitable or eleemosynary institution.

---

[2] For the text of 1887 Code § 1145, as amended, effective on the date the charter was granted see Acts 1901-02, c. 651.

The amendments created memberships in the corporation by providing that "[m]embers of the corporation shall be elected in the manner prescribed by the by-laws."

Harry C. Bach, who had then served for 21 years as the Administrator of the hospital, was the only witness who testified at the hearing upon the hospital's charitable immunity pleas. As the Administrator, Mr. Bach's duties included overall responsibility for supervision of the day-to-day operation of the hospital under direction of the hospital board. The hospital board is elected by the members of the hospital association which meets annually. The hospital's corporate officers are elected by the board.

Mr. Bach testified that the by laws restrict membership in the hospital association to persons at least 21 years of age who live within a 40 mile radius of Fredericksburg. To become a member of the association, an eligible person must apply to the hospital board which may either approve or reject the application. To maintain his membership, a member is required to pay annual dues. The record fails to disclose the number of "members of the corporation".

Mr. Bach further testified that none of the board members or corporate officers receives a salary or other remuneration and the corporation had successfully obtained exemptions from state and federal income taxes. The hospital is likewise exempt from local property taxes on its real estate and personal property.

Mr. Bach's testimony discloses that the hospital, on three occasions between 1949 and 1971, obtained federal funds to assist with expansion of its facilities. He testified that a portion of those funds would be subject to recapture by the federal government if the hospital failed to "continue as the same type of hospital . . . for a certain number of years."

The hospital's policy, according to Mr. Bach, was to admit a patient, regardless of his financial circumstance, if admission to the hospital is requested by a member of the hospital's medical staff of approximately 45 physicians. At the time of admission, the patient or one of his relatives is interviewed by a hospital employee who attempts to make arrangements for and to obtain guarantees of payment of the patient's bill. If this interview indicates that the patient is "medically indigent", the hospital conducts a further investigation. If medical indigency is

confirmed, the patient's bill is "charged off to the endowment fund or medically indigent fund."

Except for the medically indigent who "may possibly get [a] bill at the beginning of the billing mechanism", Bach's testimony shows that the hospital pursues an aggressive and vigorous program to collect patient accounts. Three employees in the accounting department devote all or most of their time to this collection program. If the account is not paid through employee efforts in from three to five months, the account is usually turned over to an attorney or collection agency for collection. Suits are often instituted and other legal steps taken against debtors as a part of the collection effort.

The hospital audit for 1971 shows that its gross receipts from patient charges that year amounted to $4,371,755.30 and its other income, including recoveries from bad debts of $59,000, amounted to $161,183.61. During the same year the hospital charged off the sum of $218,000 as bad debts. The audit also shows that the hospital had a net income or profit, over and above depreciation on its buildings and equipment, of $185,000 for the year.

While Bach testified that the hospital fixed its charges so as to "about break even", his testimony also reveals that the hospital has shown an annual net income or profit each year save one during his 21-year tenure as Administrator. This income or profit remains in the hospital's "operating fund" and "is used in the continued day-to-day operations, equipment, building, whatever the necessities might be."

The question here is whether the hospital is a charitable institution and, as such, entitled to immunity from suit for negligence of its employees. The test to be used in determining its status is set forth in *Danville Com. Hospital* v. *Thompson*, 186 Va. 746, 753, 43 S.E.2d 882, 884 (1947), where we held:

"... the test which determines whether a hospital is charitable or otherwise is its purpose, that is whether or not it is maintained for gain, profit, or advantage. * * * and the question as to its character may be determined not only from the powers and purposes as defined in its articles of incorporation or charter but also from the manner in which it is conducted. ..."

Both the plaintiffs and the hospital rely on *Thompson, supra,* and *Memorial Hospital* v. *Oakes, Adm'x.,* 200 Va. 878, 108 S.E.2d 388 (1959), the leading cases in Virginia on this subject.

In *Thompson*, we held a hospital owned and operated by the voluntary agreement of private individuals, which issued stock investing its stockholders with the usual rights and, in addition, the valuable right to free hospital services, which was managed and governed by officers and agents selected by the stockholders, and which entered a charge against its patients for its services which it collected when it could was not a charitable institution. 186 Va. at 752-53, 43 S.E.2d at 884.

In *Oakes*, the charter provided that the hospital was "formed solely for benevolent purposes", and that it was "not organized for profit and no part of the income from the operation . . . shall enure to any member or any private individual, corporation or association", and among its purposes was, "if it is possible to do so, pay its actual expenses and any surplus over and above same shall be devoted to benevolent and charitable work. . . ". The evidence there showed that no compensation was paid the officers or directors of the corporation; that no individual, firm or corporation received any return from its operation; that the corporation paid no real estate taxes or federal or state income taxes; that its goal was not to make money but to break even after depreciation; that the hospital was liberal about debt collections, 200 Va. at 882, 108 S.E.2d at 391; and that the hospital had been operated at a loss for the five years covered by the testimony. 200 Va. at 884, 108 S.E.2d at 392. There we held the hospital to be charitable and immune from suit for damages because of the negligence of its servants.

Here, we have a private corporation. While no stock is outstanding, its charter provides for the issuance of stock, stock which could be issued at any time after meeting minimum legal formalities. While the charter prohibits dividends on the stock, if stock were issued and the corporation was voluntarily dissolved thereafter, each of its shareholders would receive his pro rata share of assets of the corporation remaining after payment and discharge of the corporation's other obligations. Code § 13.1-84. Should the corporation be voluntarily dissolved, and no stock was then issued and outstanding, the members, in the plan of distribution under Code § 13.1-251, could direct the

distribution of the remaining assets to themselves after payment of the other obligations of the corporation. Code §§ 13.1-249, 250.

While no salaries or other benefits have been paid by the corporation to its members, officers and directors, there is no proscription in either the corporation's charter or in the general law which would prevent this if directed by proper corporate authority. While the Administrator testified that the hospital set its charges so as to "about break even", he later said that the rates were set at "a break-even point and a certain amount above that." The latter description appears more accurate since the record shows the hospital operated at a profit or gain for at least 20 of the preceding 21 years, and that this gain, after providing for depreciation to its buildings and equipment, amounted to $185,000 for the year 1971, the only year for which precise figures were introduced.

Unlike the hospital in *Oakes* which was so liberal in its debt collection procedures that it charged off a $3,500 bill although the patient's husband was a sawmill operator, 200 Va. at 882, 108 S.E.2d at 391, the hospital here pursues an aggressive and vigorous effort to collect for its services to the point that even "medically indigent" patients are billed for the services which they have received.

In view of the lack of any charter limitation of a charitable or eleemosynary character such as the restrictions found in *Oakes* and because the hospital has been operated over a long period of time in a manner calculated to produce a profit or gain, we hold that the hospital here fails to meet the charitable test established by *Thompson*, set forth earlier.

The judgments of the trial court sustaining the pleas of charitable immunity will be reversed and set aside; an order will be entered here overruling said pleas; and the cases will be remanded to the trial court for further proceedings.

*Reversed and remanded.*