Ann DAVIDSON, Plaintiff,

v.

The COLONIAL WILLIAMSBURG FOUNDATION, Defendant.

Civ. A. No. 4:92cv129.

United States District Court,
E.D. Virginia,
Newport News Division.

April 8, 1993.

**612**

Mary Metil Grove, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, for plaintiff.

Joseph C. Kearfott, Donald P. Boyle, Jr., Hunton & Williams, Richmond, VA, for defendant.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

In May 1990, Ann Davidson, a resident of Massachusetts, traveled with three family members to Williamsburg, Virginia to visit Colonial Williamsburg and, as she put it, to "see it all." On May 6, 1990, Davidson and her companions went to the Visitor Center at Colonial Williamsburg and bought passes necessary to gain admission to Colonial Williamsburg's museums and exhibits. The group then boarded a bus for an orientation tour of Colonial Williamsburg, intending to return the next day to resume their visit. On May 7, Davidson and her companions returned to Colonial Williamsburg and parked their car in a parking lot adjacent to the Visitor Center. As she exited her car and started walking toward the Visitor Center, however, Davidson fell and sustained injuries that form the basis of this action.

Davidson thereafter commenced this negligence action against the Colonial Williamsburg Foundation ("Foundation") seeking damages for her injuries. After a period of discovery, the Foundation moved for summary judgment under Fed.R.Civ.P. 56 on the ground that it is immune from suit under the common law doctrine of charitable tort immunity. For the reasons set forth below, the motion is denied.

## DISCUSSION

█ Under Virginia's choice of law rules, which apply in this diversity action, *see, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), Virginia law governs whether the defense of charitable immunity is available to the Foundation. *See, e.g., Egerton v. R.E. Lee Memorial Church,* 395 F.2d 381, 382 (4th Cir.1968) (applying Virginia law). Further, under the familiar standard, summary judgment is appropriate if, viewing the facts in the light most favorable to Davidson, there are no genuine issues of material fact and the Foundation is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 944 (4th Cir. 1992). Here, the material facts regarding the availability of the charitable immunity defense are not in dispute, though the parties hotly contest the legal conclusions to be drawn from the facts.

█ Although the doctrine of charitable immunity has been widely criticized, and indeed abandoned or sharply curtailed by many states, *see generally* Note, *The Quality of Mercy: "Charitable Torts" and Their Con-*

tinuing Immunity, 100 Harv.L.Rev. 1382 (1987); Janet Fairchild, Annotation, Tort Immunity of Nongovernmental Charities— Modern Status, 25 A.L.R.4th 517 (1983 & Supp.1992), it enjoys continuing vitality in Virginia. Since the Supreme Court of Virginia first adopted the doctrine of charitable immunity for the Commonwealth in the early part of this century, however, Virginia has favored a limited form of immunity that does not exempt charitable organizations from all tort liability. See Weston's Adm'x v. Hospital of St. Vincent, 131 Va. 587, 107 S.E. 785 (1921); Hospital of St. Vincent v. Thompson, 116 Va. 101, 81 S.E. 13 (1914). Rather, under Virginia law, a charitable institution is immune only from liability to its beneficiaries for the negligent conduct of its employees, provided the institution used due care in selecting and retaining its employees. See, e.g., Straley v. Urbanna Chamber of Commerce, 243 Va. 32, 413 S.E.2d 47, 49 (1992); Thrasher v. Winand, 239 Va. 338, 389 S.E.2d 699, 701 (1990); Memorial Hosp., Inc. v. Oakes, 200 Va. 878, 108 S.E.2d 388, 393 (1959); Weston's Adm'x, 107 S.E. at 792; see also Egerton, 395 F.2d at 382; Radosevic v. Virginia Intermont College, 633 F.Supp. 1084, 1086 (W.D.Va.1986) (applying Virginia law).

In Virginia, the doctrine rests on public policy, namely, that the common weal is better served if the resources of charitable institutions are used to further the institution's charitable or eleemosynary purposes, rather than to pay tort claims lodged by those who benefitted from the institution's bounty. See, e.g., Hill v. Leigh Memorial Hosp., Inc., 204 Va. 501, 132 S.E.2d 411, 415 (1963); see also Egerton, 395 F.2d at 382; Radosevic, 633 F.Supp. at 1086. Because the common law doctrine of charitable immunity has become firmly embedded in the law and public policy

of Virginia, the Supreme Court of Virginia has indicated that any changes to the doctrine must come from the legislature. Oakes, 108 S.E.2d at 396; see also Egerton, 395 F.2d at 382. In this regard, in 1974, the Virginia General Assembly eliminated charitable immunity for most hospitals, essentially limiting its application to hospitals that provide medical care free of charge. See Va. Code § 8.01–38 (Michie 1992 Repl.Vol.); Radosevic, 633 F.Supp. at 1087.

■■■ In any event, to cloak itself in charitable tort immunity, an organization must establish that it is "charitable" for purposes of the tort immunity doctrine, and that the plaintiff was a beneficiary of the organization's charitable activities at time of the allegedly tortious conduct. See, e.g., Egerton, 395 F.2d at 383; Straley, 413 S.E.2d at 49–50. The first inquiry then is whether the Foundation is "charitable" as that term applies in the context of tort immunity.[1]

■■■ In broad terms, the inquiry into whether an organization is charitable for purposes of charitable immunity focuses on whether it is " 'maintained for gain, profit, or advantage.' " Purcell v. Mary Washington Hosp. Ass'n, Inc., 217 Va. 776, 232 S.E.2d 902, 904 (1977) (citation omitted); see also Radosevic, 633 F.Supp. at 1086; Oakes, 108 S.E.2d at 392; Danville Community Hosp., Inc. v. Thompson, 186 Va. 746, 43 S.E.2d 882, 884 (1947). In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose and not for gain, profit or advantage. See, e.g., Radosevic, 633 F.Supp. at 1086; Purcell, 232 S.E.2d at 904 (Va.1977);

1. Organizations also may be deemed "charitable", of course, for purposes of exemption from income taxes under federal or state law. See 26 U.S.C. § 501(c)(3). However, because the public policy considerations underlying tax immunity are inherently different from those supporting tort immunity, characterization of an organization as "charitable" for purposes of tax immunity is not dispositive of whether an organization is entitled to charitable tort immunity. See Radosevic v. Virginia Intermont College, 633 F.Supp. 1084, 1086 n. 1 & 1089 (W.D.Va.1986); see also

Note, The Quality of Mercy: "Charitable Torts" and Their Continuing Immunity, 100 Harv.L.Rev. 1382, 1388 (1987). The fact that the negative consequence of according tax immunity, i.e., "lost" revenues, can be spread across the spectrum of the tax base, whereas the negative impact of granting charitable immunity, i.e., denying an individual the right to compensation for tortious injury, falls fully on the individual, justifies application of a more stringent standard for charitable immunity than for tax immunity.

*Oakes,* 108 S.E.2d at 392; *Thompson,* 43 S.E.2d at 884. There is a presumption that an institution operates in accordance with its charter purposes. *Oakes,* 108 S.E.2d at 392.

█ Whether an organization is "charitable" under this test turns on the facts of each case, not on the type of institution involved. *Compare Purcell,* 232 S.E.2d 902 (holding hospital not entitled to charitable immunity) *with Oakes,* 108 S.E.2d 388 (holding hospital entitled to charitable immunity) and *Ettlinger v. Trustees of Randolph–Macon College,* 31 F.2d 869 (4th Cir.1929) (examining purposes and manner of operation of college and holding it entitled to charitable immunity) *with Radosevic,* 633 F.Supp. 1084 (holding college not entitled to charitable immunity).

█ Although the inquiry into an organization's charitable status is fact-intensive, courts have considered the following factors indicative of a charitable purpose and operation: (1) whether the organization's charter limits it to charitable or eleemosynary purposes, *see, e.g., Radosevic,* 633 F.Supp. at 1089; *Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; (2) whether the organization's charter contains a "not for profit" limitation, *see Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; (3) whether the organization's goal is to break even, *see Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; (4) whether the organization earned a profit, *see, e.g., Bodenheimer v. Confederate Memorial Ass'n,* 68 F.2d 507, 508 (4th Cir.), *cert. denied,* 292 U.S. 629, 54 S.Ct. 643, 78 L.Ed. 1483 (1934); *Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes, *see, e.g., Bodenheimer,* 68 F.2d at 508; *Oakes,* 108 S.E.2d at 392; (6) whether the organization depends on contributions and donations for its existence, *see, e.g., Egerton,* 395 F.2d at 381–82; *Bodenheimer,* 68 F.2d at 509; *Ettlinger,* 31 F.2d at 871; (7) whether the organization provides its services free of charge to those

unable to pay, *see, e.g., Radosevic,* 633 F.Supp. at 1089; *Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; *Thompson,* 43 S.E.2d at 884; *cf.* Va.Code. § 8.01–38; and (8) whether the directors and officers receive compensation, *see Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392. This list of factors is illustrative, not exhaustive, and no one factor is dispositive.[2]

█ Mindful of these factors, the court turns to the relevant undisputed facts regarding the purpose and operation of the Foundation. A brief overview of the Foundation's origins and early development is helpful in understanding the Foundation's current structure and operation.

The Foundation traces its roots to 1926, when, thanks primarily to the vision and philanthropy of John D. Rockefeller, Jr., the restoration and preservation of Colonial Williamsburg began. The Foundation (then named Colonial Williamsburg, Inc.) was incorporated in 1928. As summarized by an Internal Revenue Service exemption letter in 1930, the Foundation's purpose was "to establish a charitable or benevolent [non-stock] corporation ... the actual activities of [which] are the acquiring, restoring, and preserving of historical buildings, locations, and houses, in and around the City of Williamsburg, Virginia." The income of the Foundation then consisted of "gifts and donations which [were] used in acquiring, restoring, and preserving historical objects; ... none of the income [was] credited to surplus." Moreover, except for reasonable compensation for services actually rendered, "no officer, trustee or member of the corporation" received compensation.

Until his death in 1960, Mr. Rockefeller funded the lion's share of the restoration activities. When he died, however, the Rockefeller family and organizations that funded the restoration decided that the restoration should become self-supporting. Driven by the need to become financially independent,

---

**2.** Davidson urges the court to consider whether the Foundation carries liability insurance, arguing that the need to protect charitable resources is obviated by insurance. Whatever merit this argument may have in other contexts, the Supreme Court of Virginia has indicated that the

availability of insurance does not affect the inquiry into whether an organization is entitled to charitable tort immunity. *Hill v. Leigh Memorial Hosp., Inc.,* 204 Va. 501, 132 S.E.2d 411, 415 (1963).

the Foundation has evolved from an organization wholly dependent on charitable donations into an extensive, multi-million dollar operation that accommodated approximately 900,000 visitors in 1992. Indeed, in 1991, only 8% of the Foundation's operating income came from donations and gifts. Against this backdrop, the court now discusses the current purposes and operations of the Foundation.

The articles of incorporation in effect at the time of Davidson's accident provided, in relevant part, that "[t]he Corporation is organized and operated exclusively for charitable and educational purposes," the "principal purposes" being "to preserve, restore, reconstruct, or otherwise maintain historical structures, objects, works of art, and locations and to promote, encourage, and carry on any historical, interpretive, research, or educational activities related thereto." These articles of incorporation did not limit the Foundation's expenditures to charitable or educational purposes, or expressly state that it was not operated for profit. The latter limitation was not inserted until April 1992, after Davidson's accident, though not in response to it, when the articles of incorporation were amended to provide specifically that the Foundation "shall not be operated for profit."

The Foundation is managed by a board of trustees, and has a president, eleven vice-presidents, and approximately seventy-five non-officer "directors" who manage various departments. Although the trustees receive no compensation for their twice yearly meetings, the other officers are compensated. According to the record, the salaries of the board chairman, president, and vice-presidents are substantial.

In pursuit of its charitable and educational purposes, the Foundation operates exhibits and museums in the historic area of Colonial Williamsburg, as well as nearby Carter's Grove Plantation. To enter the historic area's museums and exhibits, as well as to ride the Colonial Williamsburg tour bus, visitors must purchase tickets, the price of which is not determined by a visitor's ability to pay. To the extent that the Foundation's operations conform to its charitable and educational purposes, it is exempt from federal income tax under 26 U.S.C. § 501(c)(3).

In addition to operating the historic area's exhibits and museums, however, the Foundation has, since the 1960's, acquired and developed diverse and extensive landholdings and commercial operations. Among other things, the Foundation owns four hotels, including a conference center and health club; numerous lodging houses (both inside and outside the historic area); three golf courses; numerous restaurants both in the historic area and in the various hotels and golf clubhouses; and commercial real estate in Merchant's Square, a shopping area adjacent to the historical area, which it rents to retailers.

The Foundation also owns many product marks associated with a variety of products, such as furniture and plates, that it or its licensees sell directly to the public. Along these lines, the Foundation also operates a mail order catalog business, runs gift shops in its hotels and golf clubhouses, as well as in the historic area. As discussed below, these endeavors generate substantial revenue for the Foundation. To the extent that this revenue is not produced by the Foundation's tax exempt activities, the revenue is subject to income tax. The Foundation also pays substantial real estate and personal property taxes, comprising 23% of the tax base for those levies in the City of Williamsburg in 1990.

Although the Foundation owns all the properties and businesses listed above, its wholly-owned for-profit subsidiary, Williamsburg Hotel Properties, Inc. ("subsidiary") manages certain undertakings. Under a rental agreement with the Foundation, the subsidiary leases the four hotels from, and pays rent annually to, the Foundation. Similarly, under a management agreement with the Foundation, the subsidiary manages certain lodging and dining facilities that are part of the historic area. The subsidiary also operates the golf courses. Although the subsidiary has its own board of directors, some individuals serve both on the Foundation's board of trustees and on the subsidiary's board of directors. Many of the employees on the Foundation's payroll, such as those working in security, communications, and

purchasing and materials management, also perform services for the subsidiary. The financial statements of the Foundation and the subsidiary are prepared on a consolidated basis, with no separate publicly disclosed breakdown of revenues and expenses for the Foundation and the subsidiary.

According to the 1991 Annual Report, the financial goal of the Foundation is to hold expense growth to a rate slower than revenue growth to achieve "financial equilibrium." The record reveals that the Foundation is largely successful in achieving this goal. For each of the five years from 1987 through 1991, the Foundation's combined operations had an operating surplus, (with the exception of 1991), and maintained substantial cash reserves and a hefty endowment.

For example, in 1990, the year of Davidson's accident, the Foundation had an operating surplus of $800,000, a cash reserve of $25.5 million, and an endowment worth $186 million. Revenue for that year was: $22.3 million from ticket sales; $64.6 million from hotels and restaurants; $22.8 million from sales of products; $4 million from real estate; and $9.9 million from gifts and grants. In calculating operating surplus, the Foundation also includes a maximum 5% contribution from its endowment. During 1990, the Foundation spent $26.8 million on capital improvements, including $10.5 million for a new golf course and hotel and restaurant renovations. Capital expenditures, which are not limited solely to expenditures on improvements to the historic areas, were funded from operations, debt, or gifts. Finally, according to the deposition testimony of John S. Bacon, Secretary and Associate General Counsel of the Foundation, the Foundation may underwrite any losses the subsidiary sustains.

Considering these facts in light of the applicable legal standard, the court concludes that the Foundation is not entitled to invoke the doctrine of charitable immunity. It is true that the Foundation's charter in effect in 1990 articulated a charitable purpose, *see Bodenheimer*, 68 F.2d at 508, (entitling it to an exemption from federal income tax for some of its activities, *see* 26 U.S.C. § 501(c)(3)) and that the Foundation's mis-

sion to preserve Colonial Williamsburg is a laudable and highly beneficial one. Nevertheless, measured against the factors Virginia courts have found indicative of charitable status for purposes of charitable immunity, and taking into account the presumption that the Foundation operates in accordance with its charter purposes, the Foundation simply cannot be characterized as "charitable."

First, the articles of incorporation in effect at the time of Davidson's accident in 1990 did not state that the Foundation operated exclusively "not-for-profit." *See Oakes*, 108 S.E.2d at 392. Although the articles were later amended to add this limitation, the court finds the 1990 articles to be controlling. A contrary rule would allow an organization not previously charitable to amend its articles of incorporation in an effort to avoid antecedent tort liability. The court declines to adopt a rule that would encourage such mischief, even though there is no evidence that the Foundation was so motivated in making its 1992 charter amendments.

Second, not only is the Foundation's financial goal to earn more than it spends, *i.e.*, to turn a profit, but the Foundation enjoyed an operating surplus in four of the past five years. *See Purcell*, 232 S.E.2d at 905; *Bodenheimer*, 68 F.2d at 508; *Oakes*, 108 S.E.2d at 392. Nor did the charter in effect in 1990 restrict expenditures of the Foundation's operating surplus or other funds to not-for-profit endeavors. *See Bodenheimer*, 68 F.2d at 508; *Oakes*, 108 S.E.2d at 392. Indeed, the record reflects substantial expenditures of the Foundation's funds on, or commitment of its credit to, endeavors operated for purposes of profit, including construction of golf courses and renovations of hotels and restaurants. The Foundation can, and sometimes does, underwrite losses incurred by its for-profit subsidiary.

Third, although charitable contributions form part of the Foundation's revenues and are necessary to its operating surplus, it cannot be said, given the level of income from admissions fees, hotel and restaurant operations and product sales, that the Foundation is any longer *dependent* on contributions for its continued existence. *See Egerton*, 395 F.2d at 381–82; *Bodenheimer*, 68

F.2d at 509; *Ettlinger,* 31 F.2d at 871. Indeed, contributions supplied only 8% of the Foundation's 1991 revenue, and as little as 4.9% in 1988. *See Thompson v. Mercy Hosp.,* 483 A.2d 706, 707–08 (Me.1984).

Fourth, the Foundation pays significant salaries to its chief executive and other officers. *See Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392. Finally, the Foundation charges a fee to all visitors who wish to visit the historic area's museums and exhibits. Ticket prices are not adjusted based on ability to pay. *See, e.g., Radosevic,* 633 F.Supp. at 1089; *Purcell,* 232 S.E.2d at 905; *Oakes,* 108 S.E.2d at 392; *Thompson,* 43 S.E.2d at 884; In this regard, the court considers that the Virginia General Assembly's decision to limit the charitable immunity of hospitals only to those that provide free medical care, *see* Va.Code. § 8.01–38, evinces a public policy tending toward a restrictive approach to charitable immunity. *See Radosevic,* 633 F.Supp. at 1087; *Oakes,* 108 S.E.2d at 396.

Accordingly, considering the totality of the relevant facts and circumstances, the court concludes that the Foundation is not a charitable institution for purposes of charitable tort immunity.

The decision in *Bodenheimer v. Confederate Memorial Ass'n,* upon which the Foundation heavily relies, is readily distinguishable and does not compel a different result. In *Bodenheimer,* the United States Court of Appeals for the Fourth Circuit held that the Confederate Memorial Association was entitled to charitable immunity. The Association, whose *sole* purpose was "to collect, arrange, and preserve" historical data related to the Southern Confederacy, operated a museum for which it charged an admission fee. Unlike the Foundation, however, the Association never earned a profit. 68. F.2d at 508. And, if the Association had earned a profit, it was required by its charter to spend the surplus on acquiring "additional historical data", *i.e.,* exclusively for charitable or educational purposes. Furthermore, unlike the Foundation, the Association was "dependent upon the voluntary contributions and services of its members and friends for the continuance of its existence and activities." *Id.* at 509. For these reasons, *Bodenheimer* does not persuade the court that the Foundation is entitled to charitable immunity.

Because the court has concluded that the Foundation is not a charitable institution, it need not decide whether Davidson was a beneficiary of the Foundation at the time of her accident.

## CONCLUSION

For the foregoing reasons, the court denies the Foundation's motion for summary judgment on the ground of charitable immunity. The parties shall therefore proceed to trial on the merits. The Clerk is directed to send a copy of this Memorandum Opinion by facsimile and by first class mail to all counsel of record.

It is so ORDERED.