# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Hunter Morris,
an infant,
by his next friends,
Elizabeth Pierce Morris,
his mother,
and David R. Morris,
his father, et al.

 v.

University of Virginia
Health Services Foundation et al.

Case No. 05-163

Michael N. Ringheim

 v.

University of Virginia
Health Services Foundation
and Kenneth E. Greer

Case No. 05-152

Willard A. Searcy,
and Lisa A. Searcy,
as administrators
of the estate of
Cara Leigh Searcy,
deceased

 v.

Commonwealth of Virginia et al.

Case No. 03-240

October 25, 2006

BY JUDGE EDWARD L. HOGSHIRE

*Findings of Fact and Conclusions of Law*
*Regarding Special Pleas of Charitable Immunity*

Whereas all parties to the above-styled civil actions have agreed to consolidate the adjudication of special pleas of charitable immunity filed by the University of Virginia Health Services Foundation ("HSF") and whereas an *ore tenus* hearing was conducted August 14, 2006, with the Court having received and reviewed the memoranda of legal authorities, the exhibits introduced, and the testimony of witnesses, as well as having heard the arguments of counsel, the Court hereby renders the following Findings and Conclusions as a resolution of these issues.

*Findings of Fact*

The original Articles of Incorporation of the University of Virginia Health Services Foundation, and as revised December 16, 2002, Defendant's Hearing Exhibits 1 and 2, provide in pertinent part:

> Section 2. *Purposes and Restrictions*. The purposes for which the Foundation is formed are exclusively charitable, scientific, and education, as contemplated by Section 501(c)(3) of Internal Revenue Code of 1986, as amended. ... More particularly, the Foundation is organized and shall at all times be operated to assist medical education by teaching in a group practice setting within the academic environment of the University of Virginia (herein the "University"), and, in particular, the University's medical center; to coordinate and deliver superior patient care therein, and in connection therewith to perform a public trust without regard to race, color, creed, sex, age, or ability to pay of the patient so served. ...

The Articles of Incorporation of HSF also enumerate several charitable purposes to be carried out in concert with the University, including "[t]o assist

and conduct programs of public charity to benefit patients who might not otherwise receive or be able to afford medical attention." (Defendant's Hearing Exhibits 1 and 2.)

Plaintiffs' expert witness, Mr. Robert Tobey, testified that the IRS considers HSF to be a "public charity" pursuant to Section 501(c)(3) of the Internal Revenue Code. (Testimony of Robert Tobey, Hearing Transcript, p. 164, l. 16 – p. 165, l. 4, p. 192, ll. 3-16.) HSF is considered a "public charity" only because it is not a "private foundation." (Testimony of Robert Tobey, Hearing Transcript, p. 192, ll. 3–16.) Its tax exempt status is as a 509(a)(3) supporting organization for the University of Virginia and the University of Virginia School of Medicine. (Plaintiff's Brief, Exhibit B, p. A0001.)

On line 82a of its Form 990 tax returns filed with the IRS, HSF confirms, however, that it does not receive any donated services or use of materials, equipment, or facilities at no charge or at substantially less than fair rental value. (Plaintiff's Exhibit 5, p. J0278.)

William E. Carter, Jr., was the first CEO of HSF and, beginning in 1980, his primary task was to set up a new billing system to collect more of the receivables generated through patient care and to shorten the time of the average payment on statements. (Plaintiff's Brief, Exhibit F, p. 15, l. 14 through p. 16, l. 3; Hearing Transcript, p. 68, l. 7 through p. 69, l. 2.)

Section 2(c) of the HSF Articles of Incorporation provides that "[n]o part of the Foundation's net earnings shall inure to the benefit of any director or officer of the Foundation or to any private individual (except that reasonable compensation may be paid for services rendered to or for the Foundation)." (Defendant's Hearing Exhibits 1 and 2.)

Section 2(d) of the HSF Articles of Incorporation provides that "the Foundation shall not conduct any activities not permitted to be conducted by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986. . . ." (Defendants' Hearing, Exhibits 1 and 2.)

Upon dissolution of HSF, Section 3 of the Articles of Incorporation provides that none of the property or proceeds from the liquidation of HSF shall be distributed to any officer or director of HSF or inure to the benefit of any individual, but shall be distributed to the University of Virginia if, at the time, it remains qualified as a 501(c)(3) organization. If the University is not a 501(c)(3) organization at the time of dissolution of HSF, all proceeds of the liquidation shall be donated to an organization that is a 501(c)(3) organization and on the condition that all assets shall be used exclusively for purposes stated in the Articles of Incorporation. (Defendants' Hearing Exhibits 1 and 2.)

HSF is a not-for-profit enterprise, as defined in the accounting literature, Testimony of Robert Tobey, Hearing Transcript, p. 204, ll. 2–8, and its financial

purpose is to use all of its collected funds to further its missions. (Testimony of Kevin Higgins, Hearing Transcript, p. 56, l. 16 – p. 57, l. 4; Testimony of Bradley Haws, Hearing Transcript, p. 88, ll. 7–11, and p. 89, ll. 1–22.)

Although HSF is a not-for-profit enterprise and does not issue stock or pay out dividends to any individuals, Testimony of William Carter, Jr., Hearing Transcript, p. 72, ll. 9–17; Testimony of Robert Tobey, Hearing Transcript, p. 204, ll. 2–12, it has had a surplus for the years 2002 through 2006. (Testimony of Bradley Haws, Hearing Transcript, p. 89, ll. 4–13.)

Although the HSF Articles of Incorporation mandate that HSF must use "the whole or any part of the Foundation's income and principal exclusively for charitable, scientific, or educational purposes," Defendants' Exhibits 1 and 2, Section 2(a), Subpart (v), in the years that HSF has a surplus, such surplus is used primarily to supplement the base salaries of physicians employed by HSF, such supplementation and incentives being necessary to recruit and retain physicians. (Testimony of William Carter, Jr., Hearing Transcript, p. 70, l. 25 – p. 71, l. 23; Testimony of Bradley Haws, Hearing Transcript, p. 116, ll. 5–9.)

Physicians working at the University of Virginia Medical School are engaged with individual employment agreements, which include the standard language referenced in the Articles of Incorporation, indicating that their relationship with patients "shall remain inviolate, including, without limitation, the clinician's determination of the appropriate health care to be rendered the patient, the personal liability, if any, of the clinician with respect to the rendition of such care and the confidential relationship between the clinician and the patient." (Plaintiff's Brief, Exhibit M, p. M0154, and Exhibit N, pp. GA002, GB001, and GC001.)

Physicians working at the medical center are paid by HSF and by the Commonwealth of Virginia, which contributes $100,000 toward each physician's annual earnings. Physicians are paid by HSF according to annual contracts and are also eligible for incentive bonuses. (Plaintiff's Exhibit E, p. 39, l. 4, through p. 46, l. 23.)

"Incentives" are bonuses paid from earnings of the department in which the physician works. Incentives are subject to the recommendation of the chairman of the physician's department and the approval of the Dean of the School of Medicine. The individual department may give incentive bonuses to its attending physicians if its reserve fund is large enough to permit such bonuses after retaining a balance equal to 25% of the annual gross earnings to carry over into the next year. (Hearing Transcript, p. 112, l. 17 through p. 113, l. 12; Plaintiff's Brief, Exhibit E, p. 35, l. 11 to p. 37, l. 11; and Exhibit D, p. 29, ll. 8-17.)

As much as $17,000,000 annually is paid as incentive bonuses to physicians at HSF, who are paid such bonuses on top of the $100,000 paid by the Commonwealth of Virginia and their contractual salaries. (Plaintiff's Brief Exhibit D, p. 53, ll. 14-23.)

According to the audited financial reports of HSF prepared by the accounting firm of Ernst & Young, the total revenues of HSF for 2003, 2004 and 2005 were $193,330,000, $205,805,000 and $216,780,000, respectively. Of those amounts, $161,122,000, $173,964,000 and $175,478,000 were net patient service revenues collected in the years 2003 through 2005 respectively. The vast majority of those funds was used to pay salaries and fringe benefits, totaling $132,001,000, $143,222,000 and $146,531,000 in the years 2003 through 2005. After payment of salaries, fringe benefits and additional operating expenses, the net revenues of HSF in the years 2003 through 2005 were $2,372,000, $2,566,000 and $13,716,000, respectively. (Plaintiff's Brief, Exhibit H, p. F0007.)

HSF had net assets at the end of fiscal years 2003 through 2005 totaling $27,172,000, $31,013,000 and $61,459,000, respectively. (Plaintiff's Brief, Exhibit H, p. F0008.)

As of February 2003, HSF held $23,927,839 in reserve fund balances (Plaintiff's Brief, Exhibit J, p. PL-11.)

To the extent that HSF fails to record a net profit in a given year, this is due, in part, to the payment of incentive bonuses that exceed revenues. (Plaintiff's Brief, Exhibit D, p. 29, l. 4 through p. 30, l. 1; p. 80, l. 23 through p. 82, l. 15; and p. 95, ll. 6-10.)

In 2001 and 2002, years in which HSF maintains it did not report a net profit, it had positive net worth of $19,100,000 and $24,000,000 respectively. (Hearing Transcript, p. 127, l. 23 through p. 131, l. 7.)

HSF pays 7% of its earnings to the School of Medicine as the Dean's tax. (Plaintiff's Brief, Exhibit E, p. 28, ll. 4-17 and p. 33, ll. 10-13.)

The School of Medicine pays HSF an annual sum for the clinicians' teaching services at the Medical School. The University paid $28,800,000, $26,200,000, and $36,300,000, respectively, to HSF for professional and technical services for years 2003, 2004, and 2005. (Plaintiff's Brief, Exhibit H, p. F0024.)

HSF has long and short-term investments, including real estate and bonds. Plaintiff's Brief, Exhibit H, pp. F0005, and has three defined benefit pension plans available to its clinicians. (Plaintiff's Brief, Exhibit H, p. F0026.)

Through Piedmont Liability Trust, another tax exempt 509(a)(3) organization, all physicians engaged by HSF have full malpractice insurance

to cover any claims against them for negligent medical care rendered during their employment by HSF. (Plaintiff's Brief, Exhibit O, pp. K0025-K0032, and Exhibit D, p. 66, ll. 9-11.)

All persons presenting to HSF physicians receive medical care and treatment regardless of ability to pay or outstanding charges for services. (Testimony of Kevin Higgins, Hearing Transcript, p. 46, ll. 8–15, p. 47, l. 17 – p. 48, l. 10, p. 54, l. 8 – p. 55, l. 4; Testimony of William Carter, Jr., Hearing Transcript, p. 74, l. 23 – p. 75, l. 9, p. 86, ll. 1–11; Testimony of Bradley Haws, Hearing Transcript, p. 88, ll. 12–15, p. 90, ll. 12–19, p. 116, l. 22 – p. 117, l. 15.)

At the time a patient is deemed medically indigent, the patient's accounts are retroactively adjusted to the first date of service so the patient is not billed for any services. (Testimony of Kevin Higgins, Hearing Transcript, p. 48, l. 14 – p. 49, l. 7; p. 50, l. 12 – p. 51, l. 6; p. 60, l. 19 – p. 62, l. 13; p. 64, l. 7 – p. 65, l. 24; Testimony of Bradley Haws, Hearing Transcript, p. 98, l. 4 – p. 99, l. 8.)

HSF conducts programs which benefit indigent patients, including a telemedicine service, pediatrics clinics in remote areas, and a neurology clinic in Wise, all of which provide medical services to rural and remote communities without regard to the patient's ability to pay. (Testimony of Bradley Haws, Hearing Transcript, p. 109, l. 20 – p. 112, l. 5.)

In 2005, HSF reported $22,500,000 in forgone collections for care provided to indigent patients. (Hearing Transcript, p. 131, ll. 15-17.) For non-indigent patients, HSF is able to collect approximately 35% of such debt. (Hearing Transcript, p. 100, ll. 16-23.)

HSF received $5,500,000 in fiscal year 2005 from the University for care of indigent patients. This sum was intended to fully compensate HSF for all care rendered to indigent patients. (Hearing Transcript, p. 132, ll. 11-17.)

COO Haws stated that after reimbursement for indigent care, HSF had approximately a $1,500,000 shortfall for care provided to indigent patients in fiscal year 2005. (Hearing Transcript, p. 100, l. 24 through p. 101, l. 17.)

All patients of HSF physicians are billed for services rendered. (Plaintiff's Brief, Exhibit D, p. 59, ll. 9-15; p. 99, l. 16 through p. 100, l. 23.)

Indigent patients of HSF are billed for 100% of services provided. (Plaintiff's Brief, Exhibit D, p. 100, ll. 6-23.)

Patients with insurance are billed by HSF for co-payments and their insurance carriers pay reduced sums as contractually agreed. (Plaintiff's Brief, Exhibit D, p. 56, ll. 11-33; Hearing Transcript, p. 99, ll. 13-18.)

Patients of HSF with no insurance but the ability to pay are billed reduced fees, based upon a percentage of the Medicaid reimbursement for the same services. (Plaintiff's Brief, Exhibit D, p. 100, ll. 6-13.)

The University of Virginia Medical Center bills patients for services separately from HSF billing. (Plaintiff's Brief, Exhibit F, p. 11, ll. 1-4.)

The Form 990's filed by HSF do not indicate that HSF received money from "charity" or that its mission included any "charitable" purpose. (Plaintiff's Exhibit 5.)

The Form 990's, Schedule A, Part IV, request the taxpayer identify the reason for non-private status. Options include such things as operating as a school (box 6), a hospital (box 7), a medical research organization operated in conjunction with a hospital (box 9), an organization operated for the benefit of a college or university (box 10), an organization which receives a substantial part of its support from a governmental unit or from the general public (box 11a), a community trust (box 11b), or an organization that normally receives more than one third of its support "from contribution, membership fees, and *gross receipts from activities related to its charitable, etc., functions*" (emphasis added) and no more than one third of its support from gross investment income and unrelated business taxable income (box 12). HSF checked box 13, indicating that it was a supporting organization under 509(a)(3). (Hearing Transcript, Plaintiff's Exhibit 5, p. J0074.)

HSF's Form 990, Schedule A, Part IV, states that HSF does not consider its gross receipts from patient care to be receipts from activities related to charitable functions. (Hearing Transcript, Plaintiff's Exhibit 5, p. J0074.)

HSF obtained judgments against former patients in 5,885 cases in the last five years. (Plaintiff's Brief, Exhibit K, Defendants' Answers to Sixth Requests for Production, Response No. 22(b); Hearing Transcript, p. 58, ll. 2-9.)

HSF does not pursue collections for co-payments against Medicaid patients because Medicaid does not permit this. (Hearing Transcript, p. 58, ll. 14-18.)

HSF filed warrants in debt against 984 indigent patients in the past five years and obtained judgment in 486 cases involving indigent patients. (Plaintiff's Brief, Exhibit K, Response No. 23.)

In the past five years, 181 former patients discharged HSF judgments in bankruptcy proceedings. (Plaintiff's Brief, Exhibit K, Response No. 23; Hearing Transcript, p. 63, l. 24 through p. 64, l. 1.)

HSF employs approximately 100 full-time and 76 part-time employees in collections. Of these, the legal collections unit comprises four full-time

collectors and one full-time clerical person and an attorney on an as-needed basis when contested cases are taken to trial. (Plaintiff's Brief, Exhibit E, p. 16, 1. 16 through p. 18, 1. 12; Exhibit D, p. 39, 1. 22 through p. 40, 1. 14.)

HSF physicians are paid between the 45th and 55th percentile of physicians' compensation nationally, according to the AAMC, the Association of Academic Medical Centers. (Hearing Transcript, p. 97, ll. 1-7.)

HSF physicians currently are compensated at a level that is at the 50th to 55th percentile for physicians practicing in academic medical centers, based on data compiled by the AAMC, but historically have been compensated below the 50th percentile of the AAMC survey. (Testimony of William Carter, Jr., Hearing Transcript, p. 70, ll. 5–17; Testimony of Bradley Haws, Hearing Transcript, p. 114, ll. 10–25.)

HSF benchmarks its physicians' salaries against the national comparisons by specialty provided by the AAMC survey and pays by specialty based on the national benchmarks for that specialty. (Testimony of Bradley Haws, Hearing Transcript, p., 1. 13 – p. 116, 1. 4, and p. 126, 1. 19 – p. 127, 1. 2.)

In 2004, the five highest paid employees of HSF were each paid $100,000 by the Commonwealth of Virginia, plus substantial additional sums, including deferred compensation, ranging from $897,684 on the high end to $648,109 on the low end. (Hearing Transcript, p. 119, 1. 20 through p. 122, 1. 16; Plaintiff's Exhibit 2.)

Two of the criteria for determining who will be paid incentive bonuses and how much they will be paid are the amount of revenue generated by the clinician and the net revenue of the clinician's clinical department. (Hearing Transcript, p. 126, ll. 15-18, and p. 140, ll. 7-20; Plaintiff's Brief, Exhibit D, p. 28, 1. 17 through p. 30, 1. 9.)

From 2000 to 2005 incentive bonuses were paid to HSF physicians who served on the HSF Board of Directors on thirty-one occasions, with individual bonuses ranging in amount from $4,800 to $597,930 each. (Plaintiff's Brief, Exhibit I; Defendants' Answers to Fourth Interrogatories, Answer No. 33.)

HSF holds money in reserve because it is prudent business practice to do so. (Hearing Transcript, p. 137, 1. 23 through p. 138, 1. 2.)

To encourage potential donors to direct their philanthropy to the University of Virginia Medical School, HSF is precluded from accepting direct donations under its Affiliation Agreement with the University of Virginia. (Affiliation Agreement, Section 5.7, Defendant's Hearing Exhibit 5; Testimony of William Carter, Jr., Hearing Transcript, p. 75, 1. 10 – p. 76, 1. 5.)

For the year ending June 30, 2004, HSF received $5,267,770 in indirect public support. (HSF Form 990, Part I, 1. 1(b), Plaintiffs' Hearing Exhibit 5; Testimony of Robert Tobey, Hearing Transcript, p. 179, 1. 22 - p. 180, 1. 15.)

## Conclusions of Law

Virginia favors a restrictive approach to granting charitable immunity, evidenced by judicial reluctance to apply charitable labels to various institutions and by legislative abrogation of the doctrine, specifically in the field of medicine. *Radosevic v. Virginia Intermont Coll.*, 633 F. Supp. 1084 (W.D. Va. 1986). All hospitals are generally barred by statute from claiming charitable immunity unless they provide completely free services. Va. Code § 8.01-38. Hospitals classified as 501(c)(3) charities for tax purposes are still held liable for damages up to their insurance limits. Va. Code § 8.01-38.

Although the statute does not include medical foundations when defining hospitals, it clearly expresses the legislative policy to limit charitable immunity in the traditional halls of medicine, and no distinguishing factor suggests a more generous approach to medical foundations that engage in the same activities and hire the same physicians as hospitals.

To claim charitable immunity, an organization's articles of incorporation must have a recognized charitable purpose. *Davidson v. Colonial Williamsburg Found.*, 817 F. Supp. 611, 613 (E.D. Va. 1993). HSF's Amended and Restated Articles of Incorporation ("Articles of Incorporation") state that its purposes are "exclusively charitable, scientific, and educational as contemplated by Section 501(c)(3) of the Internal Revenue Code." Through this language, HSF has qualified as a charity for tax purposes. (Plaintiff's Brief, Exhibit B, p. A0001.) Among other tenets set forth, HSF does not take into account ability to pay and agrees to serve patients who cannot afford health care. Whether having multiple purposes besides charity suffices to claim charitable immunity deserves further consideration, and will be discussed below in respect to HSF's operation. For the first stage of establishing immunity under current law, the HSF Articles of Incorporation adequately articulate a recognized charitable purpose.

A charitable purpose raises the rebuttable presumption that the entity operates as a charity. *Ola v. Y.M.C.A. of South Hampton Roads, Inc.*, 270 Va. 550, 557 (2005), sets forth the criteria for determining whether an entity operates as a charity. Employing *Ola*'s ten-factor analysis allows courts to assess whether organizations operate consistent with that purpose.

## A. *Does the entity's charter limit the entity to a charitable or eleemosynary purpose?*

Failure to limit charitable purposes has merited more stringent treatment under the doctrine of charitable immunity. For example, the Colonial Williamsburg Foundation was denied charitable immunity largely because the "articles of incorporation did not limit the Foundation's expenditures to charitable or educational purposes," even though those purposes were included. *Davidson*, 817 F. Supp. at 613, 615. Similarly, HSF's Articles of Incorporation state charitable purposes, but do not exclusively limit the entity to that purpose. The scientific and educational goals asserted in the charter may take precedence over charitable endeavors. In fact, HSF's COO Bradley Haws and past CEO William Carter have admitted in deposition testimony that HSF chiefly serves the purposes of education, clinical research, and provision of clinical care, not charity. (Deposition of Haws at 16; Deposition of Carter at 15.) Carter further explained HSF was created primarily as a billing system "to correct that billing deficiency, get a better system and run a better operation, collect more of the professional fees. . . ." (Deposition of Carter at 15-16.) While HSF does have some charitable features, clearly charity was not the exclusive or even the central purpose in HSF's formation. Nor is charity the exclusive or even the central purpose in HSF's current functions. These facts weigh heavily against HSF as to this aspect of charitable operation.

## B. *Does the entity's charter contain a not for profit limitation?*

As a 501(c)(3) entity, HSF is recognized as not-for-profit. However, HSF's Articles of Incorporation contain no profit limitation beyond stating that none of its net earnings shall inure to benefit any director or officer beyond salary. (Plaintiff's Brief, Exhibit A, p. C0003.) Moreover, this restriction may not be meaningful, since the company bonus structure benefits some directors in their capacity as physicians. This bonus structure funnels most of HSF annual revenue directly to physicians. After meeting a threshold figure and receiving approval from the Dean of the Medical School, HSF awards incentives, department by department, to physicians from a reserve pool. When the profit reported is largely irrelevant for corporation employees who benefit from the hefty bonuses that reduce or eliminate that figure, profit records cannot bolster a claim of charitable immunity.

*C. Is the entity's financial purpose to break even or earn a profit?*

While the Articles of Incorporation are silent on profit limits, HSF's 501(c)(3) status signals a not-for-profit purpose, and Haws asserted in his deposition testimony that HSF does not try to carry a margin or earn a profit. (Deposition of Haws at 53.) Nonetheless, as set forth above, the bonus structure of HSF belies the presumption that HSF does not intend to earn additional, substantial revenues with which to pay handsome compensation to its physicians.

*D. Does the entity in fact earn a profit, and, if so, how often does that occur?*

For at least the last three years, HSF has consistently earned a surplus because revenues and investments have exceeded expenses, even with incentive bonuses. Furthermore, the 2005 audited financial report reveals that HSF had staggering total and net assets. This wealth of resources and reserves is radically incongruent with the traditional conception of a struggling charity in need of public support.

*E. If the entity earns a profit, a surplus beyond expenses, must that be used for a charitable purpose?*

*Ola* considers crucial "whether any profit or surplus is used to further the charitable purpose of the organization," rather than whether an entity exceeds expenses. 270 Va. at 562. In that case, the YMCA required all property or profit to be used for charitable purposes, and even upon dissolution, all assets had to be distributed to a nonprofit fund. *Id.* at 560. Some of the surplus generated by HSF does indeed support clinical research, educational programs, and indigent care. However, in 2005 the state reimbursed HSF in the amount of $5,500,000 for treating indigents; consequently, the net loss from treating indigents was a relatively insignificant sum. (Deposition of Haws at 56-57.)

Furthermore, the use of HSF's millions in surplus is diametrically opposed to the approach of *Ola*'s YMCA. Most of this surplus beyond expenses does not go to charitable purposes, but rather finances physician bonuses as earlier described. Generously supplementing the salaries of physicians with surplus funds cannot be viewed as furthering charitable purposes.

F. *Does the entity depend on contributions and donations for a substantial portion of its existence?*

*Ola* affirmed that charitable immunity is justified because it encourages donations, since public policy "admits the necessity of public and private contributions to carry on the organization's charitable purpose." 270 Va. at 562. In that case, the YMCA received one-third of its revenues from publicly donated funds. *Id.* Conversely, HSF does not receive any charitable contributions, and in fact expressly prohibits them. Its agreement with the University of Virginia prohibits HSF from independently accepting charitable donations. COO Haws admits and financial reports confirm that HSF derives none of its revenue from charitable donations. (Deposition of Haws at 33; HSF's Form 990 Return of Organization Exempt from Income Tax.)

G. *Is the entity exempt from federal income tax and/or local real estate tax?*

Many non-charitable entities qualify for tax exemptions under the Internal Revenue Code's Section 501(c)(3), such as schools, laboratories, and organizations promoting sports or condemning animal cruelty. 26 U.S.C. § 501(c)(3). Since "the public policy considerations underlying tax immunity are inherently different from those supporting tort immunity, characterization of an organization as 'charitable' for purposes of tax immunity is not dispositive of whether an organization is entitled to charitable tort immunity." *Davidson,* 817 F. Supp. at 613. Tax exemptions spread "lost" revenues across the spectrum of the tax base, while charitable immunity bars individuals from recovering for tortious injury, a heavier burden that "justifies application of a more stringent standard for charitable immunity than for tax immunity." *Id.* HSF is defined as a charity for tax purposes because it is not a private foundation. Tax exemption status thus has only limited weight in showing that HSF operates as a charity.

Moreover, when tax-exempt status is purely derivative of supported organizations that do not qualify for charitable immunity, that status should carry even less weight in an analysis of charitable operation. According to the IRS, HSF is tax-exempt under 501(c)(3) as a 509(a)(3) supporting organization of the University of Virginia and its School of Medicine. (Plaintiff's Brief, Exhibit B, p. A0001.) These organizations are tax-exempt as state institutions, not as charities. Beyond its role in the state government, the University of Virginia Medical Center could not qualify for charitable

immunity because of its status as a hospital. To grant HSF charitable immunity as a supporting organization of the University of Virginia while denying the University of Virginia charitable immunity would be peculiar logic.

*H. Does the entity's provision of services take into consideration a person's ability to pay for such services?*

According to its Articles of Incorporation, HSF does not refuse people treatment on any financial basis. However, HSF was created primarily to correct serious billing problems, and thus operates with expectations of payment. (Deposition of Carter at 15-16.) HSF's legal department has sought collections and judgments against indigent patients; however, if indigents properly demonstrate their indigency, efforts to collect from them are significantly diminished. (Testimony of HSF Director of Billing Operations Kevin Higgins.) Providing free treatment to some indigents does not morph a medical organization into a charity, especially when Virginia hospitals are required by law to provide emergency medical care to indigents but are barred from claiming charitable immunity. 42 U.S.C. § 1395dd; Va. Code § 8.01-38.

*I. Does the entity have stockholders or others with an equity stake in its capital?*

Incorporated as a non-stock corporation, HSF does not have stockholders or others with an equity stake in its capital. However, the physicians have a stake in the excess revenue over expenses, since they receive substantial bonuses out of that revenue pool.

*J. Are the directors and officers of the entity compensated and, if so, on what basis?*

The Articles of Incorporation provide for reasonable compensation for those rendering services to HSF, which includes their board of directors. Several of the directors are further compensated because they are also physicians, and thus receive annual incentive bonuses in that capacity. As to physician compensation, the Dean of the Medical School and HSF adjust the incentive bonuses in light of data from the Association of American Medical Colleges, which provides information about average physician faculty compensation. (Deposition of Haws at 52.) However, even if the incentives

only serve to elevate the wages of physicians to that of comparable physicians nationwide, this demonstrates that HSF physicians are in similar positions doing similar work with similar paychecks as their peers, and should similarly be ineligible for charitable immunity.

The closing inquires of *Ola* probe the charitableness of an organization by asking whether it primarily benefits those who run it or those it serves. Those who most benefit from HSF *are the physicians themselves*, as employees and directors; they have a stake in the financial successes of HSF. Their success effectively dismantles the plea of charitable immunity. To the extent that a presumption was created by the Articles of Incorporation of HSF that it is entitled to charitable immunity, the presumption has been soundly rebutted by the evidence presented as outlined above.

## Conclusion

Weighing the factors delineated in *Ola* supports the conclusion that HSF does not qualify for charitable immunity and that the Special Plea of Charitable Immunity must, therefore, be denied.