456

## CIRCUIT COURT OF THE CITY OF NORFOLK

Adijat Jassima Ola et al.

v.

Young Men's Christian
Association of South
Hampton Roads, Inc.

September 10, 2004

Case No. (Law) CL03-2755

BY JUDGE CHARLES E. POSTON

This case is before the Court on the Defendant's Plea in Bar asserting that Plaintiff's claim must be dismissed under the doctrine of charitable immunity. Having considered the evidence presented at an *ore tenus* hearing on July 13, 2004, and the written submissions of the parties, the Court sustains the Plea in Bar.

*Facts*

On April 4, 2002, Adijat Jassima Ola, a minor and member of the Young Men's Christian Association of South Hampton Roads, was abducted and sexually assaulted in a bathroom on the premises of the YMCA's Suffolk branch by Alphonso Levern Ellis. The sexual assault occurred while Ola was using the YMCA's swimming pool. Plaintiffs, Adijat Jassima Ola and Chantae and Michael Ola, her parents, claim that the YMCA negligently caused Ola's injury by allowing Ellis onto the premises and failing adequately to secure the bathroom facilities.

The YMCA is a non-stock, non-profit Virginia corporation organized "to put Judeo-Christian principles into practice through programs that build healthy body, mind, and spirit for all." (Articles of Incorporation.) Although it was organized and incorporated in Hampton Roads in the late 1800's, the

YMCA most recently amended its articles of incorporation and related organizational documents in 2000. The articles in effect at the time of Ola's injury provide, in relevant part, that the YMCA "is organized and shall be operated exclusively for one or more charitable, religious, educational, and scientific purposes as specified in Section 501(c)(3) of the Internal Revenue Code of 1986," and is regarded "as being in its essential genius, a worldwide fellowship united by a common loyalty to Jesus Christ."

The YMCA's corporate bylaws also set forth core principles and beliefs. In particular the bylaws state that:

> in giving effect to its ideals and values, the [YMCA] offers to those participating in its programs opportunities for experiences that will help them:
>
> A. To develop self-confidence and self-respect and an appreciation of their own worth as individuals;
>
> B. To develop a faith for daily living based upon the teachings of Jesus and thereby reach their highest potential as children of God;
>
> C. To grow as responsible members of their families and citizens of their communities;
>
> D. To appreciate that health of mind and body is a sacred gift and that physical fitness and mental well-being are conditions to be achieved and maintained;
>
> E. To recognize the worth of all persons and to work for interracial and intergroup understanding;
>
> F. To develop a sense of world-mindedness and to work for worldwide understanding; and
>
> G. To develop their capacities for leadership and how to use such capacity responsibly in their own groups and community life.

Additionally, the YMCA "welcomes as members all persons who wish to join and cooperate in support of the ideals and values for which [YMCA] stands."

In 1942, the Federal Internal Revenue Service recognized the YMCA as tax-exempt under Section 501(c)(3) of the Internal Revenue Code. Section 501(c)(3) exempts corporations organized and operated exclusively for

charitable purposes from federal income tax. The YMCA's status as tax-exempt was recently reaffirmed in 1993.[1] Consistent with this status, the YMCA is not subject to federal taxation other than social security taxes, and donations to the YMCA are tax deductible. Similarly, the YMCA is exempt from state income taxes, and by virtue of its exclusively charitable, not-for-profit status, the General Assembly specifically exempted the YMCA from property taxes. Virginia Code § 58.1-3606.

The YMCA's articles of incorporation specifically preclude it from being operated as a for-profit entity:

> [T]he corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from Federal income tax under Section 501(c)(3) of the [Internal Revenue Code of 1986], or the corresponding provision of any future federal tax code or by a corporation, contributions to which are deductible under Section 170(2) of the [Internal Revenue Code of 1986] or the corresponding provision of any future federal tax code.

The articles further declare that "[t]he property of the corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the corporation shall ever inure to the benefit of any director or officer thereof or to the benefit of any private person." Even if the YMCA dissolves or loses its non-profit status, its assets are dedicated to the furtherance of its charitable mission and may not be distributed to any individuals or for any private purpose.

The YMCA's stated fiscal policy is to maintain financial stability. Pursuant to its three goals of "Cover[ing] our Costs, Preserv[ing] the Present, [and] Secur[ing] the Future," the YMCA sets membership rates at a level where it can maintain its current operations while reinvesting for its future. Over the past five years, the YMCA has expanded its branches and facilities, and as a result, its revenues and expenses have grown considerably. It has

---

[1] The YMCA reports all of its income and expenses to the IRS by filing an informational return on IRS Form 990. Therein, the YMCA details, *inter alia*, its primary exempt purposes, its fixed assets, and its investments. The YMCA=s statement of primary exempt purpose contained in its information return for tax year 2002 states in part as follows: "For over 100 years, the YMCA has been putting Judeo-Christian principles into practice through programs which promote good health, strong families, youth leadership, community development, and international understanding. The YMCA welcomes people of all ages, sexes, ethnic origin, and religious affiliation. The YMCA of South Hampton Roads is a non-profit organization dedicated to providing quality programs, services, and activities for the youth, adult, and families of South Hampton Roads."

recorded surpluses in four of the last five years. The YMCA recorded budget surpluses of 1.9 million dollars in 1999, 1.7 million dollars in 2000, 297,000 dollars in 2001, and 680,000 dollars in 2003. The YMCA recorded a budget deficit of 1.24 million dollars in 2002. The YMCA's surplus is not available for distribution to an individual or for any private purpose, and its existence is consistent with its goals, especially the goal to "secure the future."

In 2002, the YMCA's public support accounted for 29% of its revenues, with the remaining revenue being generated mostly from membership and program fees. The YMCA's workforce is comprised primarily of paid employees. Even though salaries and benefits accounted for 57% of the YMCA's functional expenses, none of the employees' salaries appears to be overly generous. Despite its reliance on paid employees, the YMCA also receives a great deal of assistance from volunteers. In fact 25% of the YMCA's workforce is comprised of unpaid volunteers. These volunteers fulfill critical roles in the YMCA by serving as babysitters, child-care providers, mentors, coaches, physical fitness instructors, and maintenance workers.

The YMCA develops facilities by constructing new, complete facilities and by renovating and expanding existing facilities. Funds for developing facilities come from individual donors and debt financing. The facility at which Ola's claims arose had been developed from two pre-existing facilities. The United Way purchased one of the pre-existing facilities and private supporters purchased the other. Both facilities were donated to the YMCA debt-free. The YMCA renovated the two facilities into the current structure that contains a full gymnasium, weight rooms, cardiovascular facilities, two racquetball courts, three swimming pools, a nursery, a family activity room, and four classrooms.

Public support has a great impact on the YMCA's charitable operations. Between 1999 and 2002, public support for the YMCA ranged between 7.3 million dollars and 8.7 million dollars. In 2002, public support (meaning funds that are donated to the YMCA rather than earned by the YMCA) accounted for 29% of its revenues. This comprises nearly one third of the YMCA's total operating expenses and nearly equaled the fees the YMCA collected for participation in its programs.

The YMCA offers multiple programs pursuant to its mission. Fees are charged for many of the programs, but public funding finances some of the programs. The variety of programs offered includes: school-aged childcare, educational services, parenting programs, an "InnerActive Mobile Learning Center," and teenaged youth programs. Even though Ola did not participate in any of these programs, she did benefit from the YMCA's "Open Doors" program.

Through the "Open Doors" program, anyone desiring membership in the YMCA can request financial assistance, which may be given in full or in part based upon need. The YMCA denies no person membership due to an inability to pay. "Open Doors" operates confidentially and draws from donations to the YMCA's "We Build People" campaign, which provides subsidies to children, families, and other people who seek to be involved in certain YMCA programs. The "Open Doors" program brochure explains in part:

> The YMCA's doors are open to people of all ages, backgrounds, abilities, and incomes. ... In order to foster a sense of ownership in the YMCA, you will be asked to pay some portion of the fees. ... Scholarships will be awarded on a first come, first served basis, subject to available funds and ability.

The Plaintiffs requested financial assistance for a family membership through "Open Doors" in July 1999. Plaintiff Chantae Ola signed the form and listed Adijat Ola as one of the dependent children who would use the family membership. Chantae Ola stated that she was requesting financial assistance because of limited income and suggested that she could afford to pay $20 per month. Chantae Ola included documentation of her family's income with the request for financial assistance. The YMCA admitted the Ola family as members for $20.30 per month in fees (35% of the normal family membership rate at the time). The YMCA collected the same amount from the Plaintiffs through the time of the assault and until February 2003. Today, the YMCA's normal family membership rate is $69 per month, and the Plaintiffs pay $28.30. The Plaintiffs' family membership entitles them to use all of the branches operated by the YMCA, access to the YMCA's Teen Centers, babysitting for family members through age 8, participation in exercise classes and fitness evaluations, participation in certain youth programs, and discounts on all other programs offered by the YMCA.

## Discussion

A plea in bar is a defensive pleading that reduces the litigation to a single issue, which, if proven, creates a bar to the plaintiff's right of recovery. *Cooper Indus., Inc. v. Melendez*, 260 Va. 578, 594, 537 S.E.2d 580, 590 (2000). Upon agreement by the parties, that issue may be submitted, with an identified body of facts, for the trial court's determination. *Stanardsville Vol. Fire Co. v. Berry*, 229 Va. 578, 586, 331 S.E.2d 466, 471 (1985). Here, in agreeing to proceed on the plea in bar, the parties submitted to the trial court a stipulation of facts and exhibits and the Court heard testimony *ore tenus*

underlying the single issue of whether the charitable immunity defense is available to the YMCA.

The doctrine of limited immunity applicable to charitable organizations is "firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State." *Memorial Hosp. v. Oakes*, 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959). Under the rule of charitable immunity, "charitable institutions are immune from liability based upon claims of negligence asserted by those who accept their charitable benefits." *Thrasher v. Winand*, 239 Va. 338, 340, 389 S.E.2d 669, 701 (1990) (citing *Weston's Adm'x v. St. Vincent, etc.*, 131 Va. 587, 601, 107 S.E. 785, 790 (1921)). An organization receives charitable immunity upon the showing that its purpose and practice are charitable and that the plaintiff was a beneficiary of its charity. *Davidson v. Colonial Williamsburg Found.*, 817 F. Supp. 611, 613 (E.D. Va. 1993).

## A. *The YMCA is a Charitable Organization*

The first inquiry is whether the YMCA is "charitable" as that term applies in the context of tort immunity. "In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose and not for gain, profit, or advantage." *Davidson*, 817 F. Supp. at 613. If an organization's charter sets forth a charitable purpose, there is a rebuttable presumption that the organization is operating as a charitable institution in accordance with such purpose. *Bailey v. Lancaster Ruritan Recreation Center, Inc.*, 256 Va. 221, 225, 504 S.E.2d 621, 623 (1998) (citing *Oakes*, 200 Va. at 883, 108 S.E.2d at 392).

When determining whether a particular organization is "charitable," a court must examine the organization individually, based upon its specific facts, with no reference to the type of institution involved. *Davidson*, 817 F. Supp. at 614. Among the factors to consider are:

> (1) Whether the organization's charter limits it to charitable or eleemosynary purposes; (2) Whether the organization's charter contains a "not for profit" limitation; (3) Whether the organization's goal is to break even; (4) Whether the organization earned a profit; (5) Whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) Whether the organization depends on contributions and donations for its existence; (7) Whether the organization provides its services free of charge to

those unable to pay; and (8) Whether the directors and officer receive compensation. This list of factors is illustrative, not exhaustive, and no one factor is dispositive.

*Id.* (citations omitted).

In light of these factors, the Court turns to the relevant undisputed facts regarding the purpose and operation of the YMCA. The YMCA's articles of incorporation provide that the organization was formed "to put Judeo-Christian principles into practice through programs that build healthy body, mind, and spirit for all." This is clearly a charitable purpose and thus creates a presumption that the YMCA is operating as a charitable institution in accordance with its charter purposes. Consistent with this charitable presumption, the evidence shows that the YMCA has no stockholders; that it is a non-profit corporation; that no private individual receives any return from its operation; that charitable contributions form a substantial part of the organization's revenues; that its goal is to maintain financial stability; that any property or profit must be used for charitable purposes; that it is exempt from federal and state income and property taxes; that those who are able to pay are expected to pay, but those who are unable to pay are not pressed for payment and they are provided services free of charge, and that no one is refused admittance to become a member of the YMCA. Measured against the factors Virginia courts have found indicative of charitable status for purposes of charitable immunity, the Court concludes that the YMCA must be characterized as "charitable."

Despite the presence of those factors, the Plaintiffs, relying on *Bailey v. Lancaster Ruritan Rec. Ctr., Inc.,* 256 Va. 221, 504 S.E.2d 621 (1998), contend that the YMCA should not be characterized as a charitable organization. In *Bailey,* the Supreme Court of Virginia held that the defendant nonstock corporation did not carry the burden of proving that it was a charitable institution. The defendant owned, operated, and supervised a swimming pool on its premises. According to the defendant's charter, its purpose was to "operate a >civic center, club, social or recreation center' and to >provide funds for the carrying on of religious, charitable, scientific, literary, historical, or education programs'." *Id.* at 224, 504 S.E.2d at 623. The charter further provided that no part of the funds shall "inure to the benefit of any trustee, director, or member of said corporation." *Id.* Even though these stated purposes afforded the defendant the benefit of the charitable presumption, they alone were not sufficient to prove that the defendant was a charitable institution. On the contrary, the court found that because the defendant's only charitable activity was the operation of a swimming pool; that the defendant's funds were never devoted or donated to a charitable

purpose; that it restricted its membership to those members who were accepted by a majority vote of the board of directors; that it was not exempt from state and federal property and income taxes, and that its charter failed to state any not for profit objective or any limitation requiring the corporation to be operated only in a nonprofit manner, its overriding purpose was to own and operate a private swimming pool for the exclusive use of its members and thus did not qualify as a charitable organization. *Id.* at 227, 504 S.E.2d at 624.

The Plaintiffs argue that the YMCA is similar to the defendant corporation in *Bailey*, and thus should not qualify as a charitable institution. It is true that both the defendant in *Bailey* and the YMCA have charitable purposes and prohibit private individuals from benefiting from the corporation's activities. However, the similarities stop there. Unlike the defendant in *Bailey*, the YMCA does not hold a vote to determine its members; it is exempt from all property and income taxes; its charter contains a not for profit limitation; and it provides more charitable benefit than the mere operation of a swimming pool. The YMCA provides a vast array of charitable programs including school-aged child-care, educational services, parenting programs, teenaged youth programs, and financial assistance programs. Because of these differences, the Court finds that *Bailey* is distinguishable from the case at bar and thus is not controlling.

Contrary to the Plaintiffs' view, the opinion in *Memorial Hosp. v. Oakes*, 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959), presents facts similar to those in the case at bar. In *Oakes*, the Supreme Court of Virginia held that a hospital was charitable and thus immune from a claim for negligence damages. In reaching this decision, the court analyzed the various characteristics of the defendant organization. The court looked to the fact that the hospital was "formed solely for benevolent purposes," and that it was "not organized for profit and no part of the income from the operation ... shall enure to any member or any private individual, corporation, or association," and among its purposes was, "if it is possible to do so, pay its actual expenses and any surplus over and above same shall be devoted to benevolent and charitable work. . . ." *Id.* at 884, 108 S.E.2d at 392. In addition, the court noted that no compensation was paid to officers or directors of the corporation; that no individual, firm, or corporation received any return from its operation; that the corporation paid no real estate taxes or federal or state income taxes; that its goal was not to make money, but to break even after depreciation; that the hospital was liberal about debt collections; and that the hospital had been operating at a loss for the five years covered by the testimony. *Id.* The YMCA

here holds all of these same qualities.[2] The only difference is that the YMCA has accumulated a surplus in four of the last five years. This factor, however, does not disqualify the YMCA from being classified as a charitable institution because whether a corporation makes profits or operates from a deficit is not dispositive of its status as a charitable organization. Furthermore, this factor does not carry much weight in the present analysis because any surplus made by the YMCA must be used for charitable purposes and cannot inure to any private party. *Radosevic v. Virginia Intermont College*, 633 F. Supp. 1084, 1089 (W.D. Va. 1986).

Finally, Plaintiffs argue that because the YMCA charges its members a fee, it does not qualify as a charitable institution. The court in *Ettlinger v. Trustees of Randolph-Macon College*, 31 F.2d 869 (4th Cir. 1929), however, ruled otherwise.[3] In *Ettlinger*, the Fourth Circuit Court of Appeals upheld the trial court's holding that the defendant was a charitable institution and as such not liable to plaintiff on account of the negligence of the officers. The defendant was a nonstock corporation chartered for the purpose of carrying on the work of education. Because it charged tuition to its students, the plaintiff argued that the defendant should not be cloaked with charitable immunity. In response to this argument, the court stated that the "charitable nature of an educational institution is not destroyed by the fact that it makes a charge for tuition. . . ." *Id*. at 871. The court further stated:

> The evidence in this case is that the charges made by defendant cover only a part of the cost of carrying on its work; and it is a matter of general and common knowledge that the tuition and other charges of public educational institutions and those which are privately endowed are much lower than would be required to pay even their running expenses, being purposefully made low so that education may be placed within the reach of those who need it. In a very direct and practical sense, therefore, not only are such institutions engaged in a work of charity, but the pay student as well as others is a beneficiary thereof.

*Id*. The Court agrees with this holding and finds that, even though the YMCA charged the Plaintiffs a fee, its charitable nature was not destroyed. Under the

---

[2] Neither party presented evidence to the Court regarding the YMCA=s compensation of directors and officers or debt collection practices.

[3] *See also, Hospital of St. Vincent v. Thompson*, 116 Va. 101, 104, 81 S.E. 13, 14 (1914) (Supreme Court of Virginia held that a hospital that receives "compensation from patients who are able to pay for the accommodations does not render it any the less a charitable institution in the eye of the law." ).

"Open Doors" program, the Plaintiffs were only required to pay $20 per month, a rate that was thirty-five percent of the normally family membership. The YMCA clearly did this to ensure that everyone, regardless of ability to pay, was able to benefit from its charitable services.

## B. *Plaintiff Was a Beneficiary of the YMCA at the Time of Her Injuries*

Having concluded that the YMCA is charitable organization, the Court must next determine whether Ola was, at the time of her injuries, a beneficiary of its charity. It is a well-settled rule in Virginia that immunity does not extend to invitees or strangers having no beneficial relationship to the charitable institution. *Thrasher*, 239 Va. at 341, 389 S.E.2d at 701 (citation omitted). Instead, "one who accepts the benefits either of a public or private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity." *Danville Com. Hosp. v. Thompson*, 186 Va. 746, 753, 43 S.E.2d 882, 884 (1947). "[T]o be considered a charitable beneficiary for the purpose of charitable immunity, a person must be a direct beneficiary through the receipt of money, goods, or services and not merely someone who indirectly receives charitable benefits." Barbara Ann Williams, *Charitable Immunity: What Price Hath Charity?* 28 U. Rich. L. Rev. 953, 956 (1994).

On April 4, 2002, Ola entered the YMCA's recreational facilities located in Suffolk, Virginia, and utilized the YMCA's swimming pool. While there, Ola went into the bathroom where she was sexually assaulted by Ellis. The question facing the Court, then, is whether Ola was a direct beneficiary of YMCA's charity at the time she suffered her injuries.

In the case at bar, Ola was a beneficiary of the YMCA's charitable benefits. Ola received the pecuniary benefit of financial assistance in that she paid a discounted membership fee. Because of the "Open Doors" program, Ola was able to become a member of the YMCA. With the pecuniary benefit of a sixty percent reduction in the membership fee, the Plaintiffs were able to afford the YMCA membership and benefit from its various programs, including the use of its swimming pool. Swimming clearly provides an excellent means of maintaining physical and mental well-being and thus can be characterized as a part of the YMCA's charitable benefits. Therefore, since Ola was a recipient of those benefits when she was injured, the doctrine of charitable immunity bars her recovery.

Plaintiffs put forth two arguments that Ola was not a beneficiary of YMCA's charity at the time of her injuries. First, Plaintiffs contend that, since Ola was using the bathroom at the time of the sexual assault, she was not engaging in a charitable activity. Ola became a beneficiary of the YMCA

when she entered upon its premises for the purpose of swimming. The fact that Ola was using the restroom facilities at the time of the incident does not remove her from the class of individuals who are beneficiaries of the YMCA. Ola certainly did not lose the character of a beneficiary until she had left the YMCA's premises.

Second, Plaintiffs argue that, since Ola paid a membership fee, she is barred from being considered a beneficiary for the purposes of charitable immunity. The payment of a fee by a person "does not prevent [him from] being considered beneficiaries of the charity." *Ettlinger v. Trustees of Randolph-Macon College*, 31 F.2d 869, 871 (4th Cir. 1929). "Apart from the fact that what such a student pays does not equal the cost of his education, he is a beneficiary of the charity for the reason that, but for the charitable gifts made to the institution and the charitable work which it is carrying on, it would not exist to serve him." *Id.* In the case at bar, Ola paid a fee to receive the benefits of the YMCA's services; however, this fee was sixty percent lower than the normal membership price. Therefore, since Ola would not have received the benefits of the YMCA's services without the charitable gifts made to the institution, she was clearly a beneficiary of the YMCA's charitable benefits at the time she suffered her injuries.

## Conclusion

The Young Men's Christian Association of South Hampton Roads, Inc., is a charitable organization, and Adijat Jassima Ola was a beneficiary of its charitable services at the time she was sexually assaulted by Alphonso Levern Ellis. Accordingly, her claims for damages resulting from the alleged negligence by the YMCA is barred by the doctrine of charitable immunity.