PRESENT: All the Justices

ADIJAT JASSIMA OLA, AN INFANT, BY HER
MOTHER AND NEXT FRIEND CHANTAE CHAPMAN
AGBOOLA, ET AL.

OPINION BY
v.  Record No. 050139          JUSTICE G. STEVEN AGEE
                                November 4, 2005
YMCA OF SOUTH HAMPTON ROADS, INC.

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Charles E. Poston, Judge

Adijat Jassima Ola, an infant who sues by her parents and
next friends, appeals from the judgment of the Circuit Court of
the City of Norfolk sustaining the special plea in bar of
charitable immunity by the Young Men's Christian Association of
South Hampton Roads ("YMCA") to Ola's motion for judgment
alleging negligence.  For the reasons set forth below, we will
affirm the judgment of the trial court.

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

On April 4, 2002, Ola was abducted and sexually assaulted
in a bathroom on the YMCA premises.  At the time of the assault,
the parties stipulated that Ola, then 13, "had used the YMCA's
swimming pool and was using the bathroom."  Ola filed a motion
for judgment alleging the YMCA negligently failed to prohibit
her assailant, a nonmember of the YMCA, from entering the
premises, failed to provide adequate staffing, and failed to
repair a broken lock on the bathroom, resulting in her attack
and injuries.

1

The YMCA filed a special plea in bar of charitable immunity.  In support of its plea, the YMCA presented evidence of its not-for-profit status, charitable mission and related activities.  It was stipulated that Ola's family, including Ola, were YMCA members with a subsidized membership prior to and at the time of the assault.  The YMCA contended that, as a beneficiary of the organization's charitable activities, Ola could not recover from it for her injuries.

The parties agreed to proceed on the plea in bar based on an extensive stipulation of facts and exhibits.  After a hearing ore tenus, the trial court sustained the YMCA's plea of charitable immunity in a letter opinion dated September 10, 2004, which was incorporated in its final order.  We awarded Ola this appeal.

## II. ANALYSIS

### A. The Scope of Charitable Immunity

The doctrine of charitable immunity "is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State."  Memorial Hospital, Inc. v. Oakes, 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959).  It is grounded in the public policy that the resources of charitable institutions are better used to further the institution's charitable purposes, than to pay tort claims lodged by the charity's beneficiaries.

When a portion of the responsibility [for charity] is borne by the gifts of the philanthropic-minded, so much of the burden is removed from the public. If a portion of those gifts is diverted to the payment of tort claims, without restriction, the spirit and intent of the gifts are, at once, nullified and that much of the burden is again cast upon the public.

Hill v. Leigh Memorial Hospital, Inc., 204 Va. 501, 507, 132 S.E.2d 411, 415 (1963).

Virginia has favored a limited form of charitable immunity which exempts charitable organizations from some, but not all, tort liability. See Weston v. Hospital of St. Vincent, 131 Va. 587, 610, 107 S.E. 785, 792-93 (1921). A charitable institution is immune from liability to its beneficiaries for negligence arising from acts of its servants and agents, but only if due care has been exercised in their selection and retention. Bailey v. Lancaster Ruritan Rec. Ctr., Inc., 256 Va. 221, 224, 504 S.E.2d 621, 622 (1998). That immunity does not extend, however, to invitees or strangers having no beneficial relationship to the charitable institution. Thrasher v. Winand, 239 Va. 338, 340-341, 389 S.E.2d 699, 701 (1990). Further, the shield of charitable immunity does not extend to liability for acts of gross negligence or willful and wanton negligence. Cowan v. Hospice Support Care, Inc., 268 Va. 482, 488, 603 S.E.2d 916, 919 (2004).

To establish charitable immunity as a bar to tort liability, an entity must prove at least two distinct elements.

3

The absence of either element makes the bar of charitable immunity inapplicable. First, the entity must show it is organized with a recognized charitable purpose and that it operates in fact in accord with that purpose. "In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose . . . ." Davidson v. The Colonial Williamsburg Foundation, 817 F.Supp. 611, 613 (E.D. Va. 1993).

Second, assuming the entity has met the foregoing test, it must then establish that the tort claimant was a beneficiary of the charitable institution at the time of the alleged injury. See, e.g., Straley v. Urbanna Chamber of Commerce, 243 Va. 32, 33, 413 S.E.2d 47, 48 (1992); Thrasher, 239 Va. at 339, 389 S.E.2d at 700.

Thus, in order to determine whether an entity is entitled to charitable immunity, the court first examines the powers and purposes set forth in its charter. Danville Community Hosp. v. Thompson, 186 Va. 746, 753, 43 S.E.2d 882, 884 (1947). If an organization's charter sets forth a charitable or eleemosynary purpose, there is a rebuttable presumption it operates as a charitable institution in accordance with that purpose. Oakes, 200 Va. at 883, 108 S.E.2d at 392. However, if the manner in

4

which the organization actually conducts its affairs is not in accord with the charitable purpose, then the presumption may be rebutted and the bar of charitable immunity does not apply. Danville Com. Hospital, 186 Va. at 753, 43 S.E.2d at 884.

Our prior decisions have established a number of factors that are indicative of whether a charitable organization operates in fact with a charitable purpose.[1]  These factors are not exclusive and the presence or absence of any particular factor is not determinative.  In the final analysis, whether an

---

[1](1) Does the entity's charter limit the entity to a charitable or eleemosymary purpose?  See, e.g., Oakes, 200 Va. at 883, 108 S.E.2d at 392.

(2) Does the entity's charter contain a not for profit limitation?  Id.

(3) Is the entity's financial purpose to break even or earn a profit?  Id.

(4) Does the entity in fact earn a profit, and if so, how often does that occur?  Id.

(5) If the entity earns a profit (a surplus beyond expenses) must that be used for a charitable purpose?  Id.

(6) Does the entity depend on contributions and donations for a substantial portion of its existence?  See, e.g., Weston, 131 Va. at 590, 107 S.E. at 786.

(7) Is the entity exempt from federal income tax and/or local real estate tax?  See, e.g., Bailey, 256 Va. at 225, 504 S.E.2d at 623.

(8) Does the entity's provision of services take into consideration a person's ability to pay for such services?  See, e.g., Oakes, 200 Va. at 883, 108 S.E.2d at 392.

(9) Does the entity have stockholders or others with an equity stake in its capital?  Id.

(10) Are the directors and officers of the entity compensated and if so, on what basis?  Id.

See also Davidson, 817 F.Supp. at 614.

5

entity operates as a charity turns on the facts of each case and not on the particular type of institution.  Davidson, 817 F.Supp. at 614.

## B. The Trial Court's Findings

In sustaining the YMCA's special plea in bar, the trial court undertook the analysis described above, first determining that the YMCA was a charitable organization operating in accordance with its charitable purpose, and then examining Ola's status as a beneficiary of the YMCA's charity.

The trial court first noted the YMCA's articles of incorporation clearly express a charitable purpose "to put Judeo-Christian principles into practice through programs that build a healthy body, mind and spirit for all."  This and related statements of charitable purpose in the YMCA's organizational documents established the rebuttable charitable presumption,[2] and therefore the trial court then examined the

---

[2] For example, Article II, Section 3 of the YMCA's By-Laws provides:
> In giving effect to its ideals and values, the Association offers to those who participate in its programs opportunities for experiences that will help them:
> A. to develop self-confidence and self-respect and an appreciation of their own worth as individuals;
> B. to develop a faith for daily living based upon the teachings of Jesus and thereby reach their highest potential as children of God;
> C. to grow as responsible members of their families and citizens of their communities;

actual operation of the YMCA to determine if that operation was
consistent with the presumption.  The trial court found from the
evidence

> that the YMCA has no stockholders; that it is a non-
> profit corporation; that no private individual
> receives any return from its operation; that
> charitable contributions form a substantial part of
> the organization's revenues; that its goal is to
> maintain financial stability; that any property or
> profit must be used for charitable purposes; that it
> is exempt from federal and state income and property
> taxes; that those who are able to pay are expected to
> pay, but those who are unable to pay are not pressed
> for payment and they are provided services free of
> charge, and that no one is refused admittance to
> become a member of the YMCA.

Based on these factual findings the trial court concluded
that the YMCA "[m]easured against the factors Virginia courts
have found indicative of charitable status for purposes of
charitable immunity . . . must be characterized as
'charitable.' "

The trial court then addressed Ola's contention that the
YMCA was similar to the recreation center in Bailey v. Lancaster
Ruritan Recreation Center, Inc., 256 Va. 221, 226, 504 S.E.2d

---

> D. to appreciate that health of mind and body is
> a sacred gift and that physical fitness and mental
> well-being are conditions to be achieved and
> maintained;
> E. to recognize the worth of all persons and to
> work for interracial and intergroup understanding;
> F. to develop a sense of world-mindedness and to
> work for worldwide understanding; and

621, 624 (1998), where the defense of charitable immunity was denied.  Ola argued the YMCA's swimming pool component was analogous to the swimming pool operated by the recreation center in Bailey.  She pointed out that even though the recreation center had an articulable charitable purpose, "its overriding purpose was to own and operate a private swimming pool for the exclusive use of its members and thus did not qualify as a charitable organization."

In contrast to the situation in Bailey, the trial court found the YMCA "provides more charitable benefit than the mere operation of a swimming pool" including "a vast array of charitable programs . . . ."  The trial court noted that unlike the recreation center in Bailey, "the YMCA does not hold a vote to determine its members, it is exempt from all property and income taxes, [and] its charter contains a not for profit limitation."  The trial court thus found Bailey distinguishable and not controlling authority for this case.

Having determined the YMCA to be a bona fide charitable organization operating as such, the trial court next discussed Ola's status as a beneficiary of the YMCA's charity at the time of her injuries.  The trial court determined that because Ola was using the YMCA swimming pool just prior to the attack and

---

G. to develop their capacities for leadership and how to use such capacity responsibly in their own

paid a discounted membership fee, she had "accept[ed] the benefits of [the YMCA] and enter[ed] into a relation which exempt[ed the YMCA] from liability for . . . negligence . . . ." Ola's argument that her payment of a fee, even though at a reduced rate, barred her from being considered a beneficiary of the YMCA's charity was specifically rejected by the trial court:

> [S]ince Ola would not have received the benefits of YMCA's services without the charitable gifts made to the institution, she was clearly a beneficiary of YMCA's charitable benefits at the time she suffered her injuries.

We find the trial court's analysis well reasoned and amply supported by the evidence.

### C. The Charitable Presumption

The YMCA's articles of incorporation unequivocally reflect its nonprofit, charitable status as a nonstock corporation. Article II(A) mandates that the YMCA "shall be operated exclusively for one or more charitable, religious, educational and scientific purposes."  Article II(B) then provides:

> The Young Men's Christian Association we regard as being in its essential genius a worldwide fellowship united by common loyalty to Jesus Christ for the purpose of developing Christian personality and building a Christian society. The mission statement for the corporation is to put Judeo-Christian principles into practice through programs that build healthy body, mind, and spirit for all.

(Internal quotation marks omitted).

---

groups and community life.

Under the YMCA's charter, it cannot "carry on any activities not permitted to be carried on by a corporation exempt from Federal income tax."  The YMCA's property is dedicated "to charitable purposes" even upon dissolution, when all YMCA assets must be distributed to a nonprofit fund "which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under Section 501(c)(3) of the [Internal Revenue] Code."  While the YMCA reserves the right to compensate directors or others for their services, the charter specifically states that "[n]o part of the net earnings of the corporation shall inure to the benefit of . . . its officers [or] directors."

The trial court found, and Ola does not dispute, that the charitable purpose and nonprofit structure set out in the YMCA charter established the rebuttable presumption that the YMCA is a charitable organization.  We find no error in the trial court's conclusion.

### D.   Actual Operation as a Charity

Ola argues, however, that "because of its manner of operation[,]" the YMCA "is not a 'charitable institution.' "  In effect, Ola argues the presumption that the YMCA is a charitable organization is rebutted by its actual operation.  Ola avers that, like the recreation center in Bailey, the YMCA operates as a private health club; it is staffed by paid employees, open

10

only to dues-paying members, and carries liability insurance for situations like Ola's attack.  Further, Ola points to the stipulated facts that the YMCA operated at a surplus for four of the previous five years (1999-2003), and its budget contained no separate expenditures for charitable activities.

Ola also contends that the trial court erroneously relied on the fact that 29% of the YMCA's income comes from public donations and that many of its workers are unpaid volunteers. Ola maintains that these financial and personal contributions are not "a relevant factor in determining whether the YMCA itself is a charitable institution."  Rather, she argues, "the determinative factor is the manner of the YMCA's operation and its charitable contributions to others."

We agree with the trial court that Ola has not rebutted the presumption that the YMCA is a charitable organization operating in accordance with its charitable purpose.  Ola's contention that the YMCA operates only as a private health club is without merit.  The YMCA's activities go far beyond the operation of its athletic facilities.  The stipulated facts demonstrate that the organization also operates a childcare program, teen leadership programs, literacy programs, parenting programs, wellness programs, and makes its facilities available to local community groups in order to promote its stated values throughout the community.  As particularly applicable to Ola, under the "We

11

Build People" campaign, the YMCA "[a]ssist[s] families with the cost of membership" and "[e]nable[s] children to gain confidence in the water while learning . . . swimming skills."  The YMCA staff is trained, not only to staff its facility and administer its programs, but also to promote and communicate its core values to all who participate in YMCA programs.

The fact that these programs, as well as the discounted memberships to needy families or individuals, are not separately accounted for as line items in the YMCA's financial statements was explained by Susan Ohmsen, the YMCA's Chief Financial Officer.  Like other charities, the YMCA must adhere to the accounting rules established by the Financial Accounting Standards Board which are commonly termed as GAAP (Generally Accepted Accounting Principles).[3]  Under GAAP, the YMCA is required to "record its expenses according to function."  The practical effect of this GAAP requirement in the financial statements is that charitable expenditures are "embedded in every expense line."

Further, a charitable organization may carry liability insurance and retain its charitable immunity.  As we noted above, a charity's immunity is not absolute, and suits by

_____

[3] Since 1973, the Financial Accounting Standards Board has been the designated organization in the private sector for establishing standards of financial accounting and reporting,

12

invitees or strangers for negligence will not be barred by the doctrine of charitable immunity. Thus, it is often prudent and an exercise of fiduciary responsibility for a charitable entity to carry liability insurance for protection in the appropriate circumstance.

Additionally, the fact that the YMCA generated an operational surplus in some years does not strip it of its charitable status. See Davidson, 817 F.Supp. at 614. Rather, the important consideration is whether any profit or surplus is used to further the charitable purpose of the organization. Id. Ms. Ohmsen testified that the YMCA's reliance on donated contributions makes it unable to gauge its financial situation from year to year. Therefore, the YMCA depends on any surplus to preserve the charitable programs in existence and facilitate further growth. Ms. Ohmsen noted that it is important for the organization to remain financially healthy in order to encourage donors to make donations. Again, prudence and the exercise of fiduciary responsibility fully justify a nonprofit organization accumulating a surplus, provided it continues to invest in the organization's charitable purpose or otherwise expends the surplus for a charitable purpose. Indeed, a charitable institution's inability to sometimes post a surplus may doom its

---

and its standards are officially recognized as authoritative by the federal Securities and Exchange Commission.

13

existence and end its work of charity when nonsurplus years arrive.

Finally, we cannot agree with Ola's contention that an entity's significant reliance on voluntary contributions is irrelevant to a determination of charitable status. In Weston, we noted that the defendant hospital was a charitable entity, in part because it was not self-sustaining. 131 Va. at 590, 107 S.E.2d at 786. The public policy behind the doctrine of charitable immunity admits the necessity of public and private contributions to carry on the organization's charitable purpose.

While the receipt of a minimal amount of an entity's total revenue as a charitable donation may augur against a finding that it operates in fact as a charity, the YMCA receives nearly one-third of its revenues from the public as donated funds.[4] Such a level of giving cannot be dismissed as de minimis, but should be recognized as a significant factor of charitable operation. The trial court's reliance on the YMCA's receipt of donations was appropriate.

_____

[4] In Davidson, the entity in question, the Colonial Williamsburg Foundation, was deemed not to be a charitable institution eligible to claim the bar of charitable immunity primarily because the "articles of incorporation did not limit the Foundation's expenditures to charitable or educational purposes, or expressly state that it was not operated for profit." Davidson, 817 F.Supp. at 615. The court did note that "only 8% of the Foundation's operating income came from donations and gifts," but that factor was not dispositive of the case. Id.

The trial court also correctly distinguished the recreation center in Bailey from the YMCA. While the YMCA is a "members-only" organization, it does not, like the center in Bailey, restrict membership only to those who can pay the published fee. Rather, those who seek membership, but cannot afford to pay all of the membership fee, are eligible for a subsidized membership at a discounted rate depending on the ability to pay.[5] Further, unlike the center in Bailey, the YMCA is a tax-exempt, nonprofit organization, with a significant portion of its mission funded by donations. As the YMCA is readily distinguishable under the multi-factor test from the recreation center in Bailey, that case is not determinative of the case at bar.

## E. Ola as a Charitable Beneficiary

We next address Ola's contention that she was not a beneficiary of the YMCA's charitable bounty at the time of the attack, and therefore her tort action should not be barred by the YMCA's otherwise applicable charitable immunity. Ola specifically argues that any charitable activities undertaken by the YMCA are too far removed from the negligence at issue to immunize the YMCA against liability. We disagree.

The trial court found that because Ola paid a discounted membership fee, she "received the pecuniary benefit of financial

---

[5] The fact that a charity's resources limit the number of reduced-fee memberships or services does not negate the

15

assistance" and therefore, was a recipient of the YMCA's charitable bounty.  Ola argues that this finding "implicitly holds that the YMCA owes a duty of care to members who pay full price dues but owes no duty to members who pay discounted dues." We reject Ola's argument.  The fact that an organization receives compensation from those who are able to pay for services received does not remove its charitable immunity. Hospital of St. Vincent v. Thompson, 116 Va. 101, 104, 81 S.E. 13, 14 (1914).  Thus, a court's decision to sustain a plea of charitable immunity rests solely on the organization's status as a charitable entity, not on the beneficiary's financial status. "The rich and the indigent stand on the same footing as to protection against such negligence."  Weston, 131 Va. at 597, 107 S.E. at 788.

In Virginia, a person is a beneficiary of charity if he or she has a "beneficial relationship" to the charitable organization.  Roanoke Hospital Ass'n v. Hayes, 204 Va. 703, 707, 133 S.E.2d 559, 562 (1963).  However, mere membership in a class eligible to receive future benefits, conditioned upon circumstances which might never occur, is too remote and speculative to merit beneficiary status.  Thrasher, 239 Va. at 342, 389 S.E.2d at 701.

---

applicability of charitable immunity.

Relying on this Court's precedent, the United States Court of Appeals for the Fourth Circuit has held that an individual need not receive financial assistance from a charitable entity to be a beneficiary of that organization. Instead a beneficiary is a person who receives something of value, which the organization by its charitable purpose, undertakes to provide. An individual is "a beneficiary of [charitable] bounty" if that individual's interaction with the entity "is related to the charitable purpose of the [organization]." Egerton v. R. E. Lee Memorial Church, 395 F.2d 381, 384 (4th Cir. 1968) (tourist entering historic church to view stained glass is a beneficiary). See also Bodenheimer v. Confederate Memorial Ass'n, 68 F.2d 507, 509 (4th Cir. 1934) ("Plaintiff became a beneficiary of the charity of the defendant when she entered upon its premises for the purpose of viewing the paintings and other exhibits which it had collected").

We noted in Weston, that a person who pays the full price for services is still a beneficiary of the charitable work of the charitable organization because that entity could not provide those services without charitable contributions:

> The public charity which the patient pays for the privilege of enjoying is the hospital building, with all its equipment and management, the care and nursing, and the rules and regulations under which it is operated, whereby it is kept sanitary and is made comfortable. All of these are provided by charity before the patient applies for admission, and he pays

for the privilege of enjoying them as he finds them, and his payments go to the further maintenance of the charity of which others coming after him are to enjoy the benefits.  He is receiving the benefits which charity has provided.  In this sense, he is a charity patient.

131 Va. at 596-97, 107 S.E. at 788.

Similarly, the United States Court of Appeals for the Fourth Circuit applied the same conceptual basis in determining that a student was a beneficiary of a private college's charity even if he paid full tuition:

[I]t is equally clear both that the eleemosynary or charitable nature of an educational institution is not destroyed by the fact that it makes a charge for tuition, and that the payment of tuition by its students does not prevent their being considered beneficiaries of the charity. . . . In a very direct and practical sense, therefore, not only are such institutions engaged in a work of charity, but the pay[ing] student as well as others is a beneficiary thereof.  And, apart from the fact that what such a student pays does not equal the cost of his education, he is a beneficiary of the charity for the reason that but for the charitable gifts made to the institution and the charitable work which it is carrying on, it would not exist to serve him.  These principles are settled by the overwhelming weight of authority.

Ettlinger v. Trustees of Randolph-Macon College, 31 F.2d 869, 871 (4th Cir. 1929).

We reiterated the holdings in these cases in Richmond v. Richmond Memorial Hospital, 202 Va. 86, 94, 116 S.E.2d 79, 84 (1960), noting that paying clients "as well as those who do not pay are the beneficiaries" of charitable bounty because "but for the charitable gifts made to the [organizations] and the

18

charitable work which they are carrying on they would not exist to serve [anyone]." Id.

Under this well-reasoned precedent, Ola clearly was a beneficiary of the YMCA's charity, not because she received membership at a reduced fee, but because she was participating in the YMCA swimming program at the time of her injury. The parties stipulated that just prior to the attack, Ola had used the YMCA's swimming pool. As the trial court noted, "Swimming clearly provides an excellent means of maintaining physical and mental well-being and thus can be characterized as a part of the YMCA's charitable benefits." Thus, whether Ola paid a full or reduced membership fee, she was a beneficiary of the charitable bounty of the YMCA because she actually used YMCA facilities which depend on charity for their existence and operation.

## III. CONCLUSION

The trial court correctly determined that the YMCA is a charitable organization operating in accordance with its charitable purpose. The trial court also correctly determined that Ola was a beneficiary of the YMCA's charitable bounty at the time of her injury. Accordingly, the trial court did not err in sustaining the YMCA's plea of charitable immunity. We will therefore affirm the judgment of the trial court.

Affirmed.

19