# CIRCUIT COURT OF THE CITY OF NORFOLK

Melvin L. Wright,
Administrator

v.

David F. Silver et al.

February 14, 2007

Case No. (Law) L05-2396

BY JUDGE EVERETT A. MARTIN, JR.

The plaintiff complains that his decedent was injured by and died as a result of defendant Silver's negligent performance of an abdominal operation in which his decedent's sigmoid colon was punctured. The plaintiff further alleges that Silver's negligent acts occurred during the scope of his employment with defendant EVMS Academic Physicians and Surgeons Health Services Foundation. The defendants have answered denying any negligence but admitting Silver's actions were within the scope of his employment with the Foundation. They have also filed pleas of charitable immunity. At the hearing on November 20, 2006, Mr. Geib, counsel for the plaintiff, conceded he did not have evidence of gross negligence and that sustaining the pleas would result in the dismissal of the action. I received the last brief addressing the plea on December 28.

*Code of Virginia § 8.01-38*

The plaintiff claims Code of Virginia § 8.01-38 bars the claim of charitable immunity. That statute provides:

> Hospital as referred to in this section shall include any institution within the definition of hospital in § 32.1-123.
>
> No hospital, as defined in this section, shall be immune from negligence ... on the ground that it is a charitable institution. . . .

"Hospital" is defined in § 32.1-123 as:

> any facility licensed pursuant to this article in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals, including hospitals known by varying nomenclature or designation such as sanatoriums, sanitariums, and general, acute, rehabilitation, chronic disease, short-term, long-term, outpatient surgical, and inpatient or outpatient maternity hospitals.

The Foundation's Restated Articles of Incorporation of June 1991 state its purposes. Exhibit 8. Nothing would be served by reciting them at length, but, in short, its purpose is to employ physicians to provide hospital and medical care and to assist in medical education and research. Mr. James Lind, the Foundation's chief executive officer and the only witness at the hearing, testified the Foundation does not own any facilities and does not operate as a hospital. Transcript, pp. 40-41.

"Facility" is defined as "something designed, built, installed, etc. to serve a specific function affording a convenience or service." *Webster's Encyclopedia Unabridged Dictionary of the English Language* (1983). It denotes something tangible. I find the Foundation is not a "facility."

Furthermore, for a "facility" to be a "hospital" it must be "licensed pursuant to this article." Mr. Lind testified the Foundation is not so licensed. Transcript, p. 41. Thus the Foundation cannot be a hospital.

The General Assembly could have abrogated charitable immunity for doctors and their employers. In § 8.01-38, it chose only to do so for hospitals. If the immunity of doctors employed in charitable medical work is to be

abolished, it should be by the General Assembly, not by a court's strained construction of a statute. Judge Bellows reached the same conclusion in *MacArthur v. University of Va. Health Services Found.*, Case No. CL04-154 (Charlottesville Cir. Ct. Dec. 8, 2006)

## Charitable Immunity

In *Ola v. YMCA of South Hampton Roads, Inc.*, 270 Va. 550, 621 S.E.2d 70 (2005), the Supreme Court reaffirmed the doctrine of charitable immunity and stated what an organization must prove to be entitled to the defense. The Foundation must show it is organized for a recognized charitable purpose and that it actually operates in accord with that purpose. If these showings are made, the Foundation must also show the plaintiff's decedent was a beneficiary of its services when she was injured. The Foundation, however, is entitled to a rebuttable presumption that it operates as a charitable institution if it satisfies a very low threshold: its charter sets forth a charitable purpose. The presumption may be rebutted and immunity lost if the Foundation is shown not to conduct its affairs for a charitable purpose. *Ola*, 270 Va. 556-57, 621 S.E.2d 72-73.

## The Foundation's Charter

The Foundation gets the rebuttable presumption. The Restated Articles of Incorporation show it was organized for a recognized charitable purpose. Exhibit 8. It also received a determination letter dated January 29, 1993, from the Internal Revenue Service recognizing it as an exempt organization under § 501(c)(3) of the Internal Revenue Code. Exhibit 9.

## The Foundation's Operations

The Foundation was established in conjunction with the Eastern Virginia Medical School ("EVMS") to provide an opportunity for members of the EVMS faculty to have a clinical practice and thereby improve the quality of medical care in this area and to further the education and training of medical students. EVMS itself would not be able to pay sufficient salaries to attract highly qualified doctors to teach. The income the doctors earn through their clinical practice with the Foundation supplements what EVMS can pay

them. Nonetheless, the total compensation a doctor earns from EMVS and the Foundation is usually about the mean national pay in the field. Transcript, pp. 35-38, 45-47, 52-53, 58, 69-70.

The contracts among EVMS, the Foundation, and the doctor contain a restrictive covenant and non-solicitation provisions. Exhibit 11; transcript, p. 60. These are not usually associated with charity work.

Most of the Foundation's revenue is derived from bills to patients or their insurers. It receives an indigent care appropriation from the Commonwealth through EVMS that is about 2% of "net patient revenue," that is, actual receipts. The Foundation actually provides indigent care valued between $2,500,000 and $3,000,000. Indigent care is about 3% to 4% of the Foundation's "gross patient revenue," which means the value of the services provided, not monies received. Exhibits 13, 14; transcript pp. 73, 93, 116, 148-52. Most of the actual receipts come from payments from private or government insurance.

The Foundation collects on bills "appropriate to the patient's financial status," and it sometimes files suit in court to collect. Transcript, pp. 130, 136. However, if a patient meets the state's indigency requirements, the balance is written off at the time of service and no payment is expected. Transcript, pp. 129, 135.

The Foundation provides physician services in many specialties, and it provides malpractice insurance for the physicians. Transcript, pp. 119-20, 143-47. The provision of liability insurance does not defeat charitable immunity. *Ola*, 270 Va. at 561, 621 S.E.2d at 75.

In *Ola*, the Supreme Court set out ten factors to be considered in determining if the organization operates in fact for a charitable purpose. The factors are not exclusive and no one is determinative. Whether the Foundation operates as a charity turns on the facts. 270 Va. at 557, n. 10, 621 S.E.2d at 74, n. 10.

*Does the Foundation's charter limit it to a charitable purpose?*

The Restated Articles of Incorporation (Exhibit 8) provide in article II (a): "The purposes for which the Foundation is formed are exclusively charitable, scientific, and educational, as contemplated by Section 501(c)(3) of the Internal Revenue Code. . . ." Subsequent paragraphs amplify these purposes and paragraph (d) specifically prohibits the Foundation from engaging in activities not permitted to be conducted by a tax-exempt organization.

*Does the Foundation's charter contain a not-for-profit limitation?*

The Restated Articles of Incorporation do not so provide. They provide that no part of its net earnings shall inure to be benefit of its officers or directors or any private person. Its By-Laws provide in section 7.9 that the Foundations keeps 70% of its net operating revenues and gives the other 30% to EVMS. Exhibit 7.

*Is the Foundation's financial purpose*
*to break even or to earn a profit?*

Mr. Lind testified that, in some years, the Foundation earns a small profit and that, in other years, it has a small loss, and this is shown by the financial statements admitted at the hearing. Exhibits 13 and 14. This result is dictated by its By-Laws and by paragraph 12 of its Initial Affiliation Agreement with what is now the EVMS. Exhibit 10. As stated above, 70% of the net operating revenue is retained by the Foundation and 30% is given to EVMS. The 70% retained by the Foundation is used to give bonuses to its doctors. The Foundation does not have a purpose to break even as that term is commonly understood. It has among its purposes the supplementation of the salaries EVMS pays its physician professors.

*Does the Foundation in fact earn a profit*
*and, if so, how often does it occur?*

The Foundation in fact does earn a profit, and a rather substantial one at that. In 2003, the "operating excess" was $6,368,943; in 2004, it was $7,604,856; in 2005, it was $7,604,187. It appears to earn a profit regularly.

*If the Foundation earns a profit (a surplus beyond expenses),*
*must that be used for a charitable purpose?*

Most of the Foundation's "surplus beyond expenses" is used to give additional compensation to its doctors. The amount used to pay bonuses to the doctors was $4,457,747 in 2003, $5,323,197 in 2004, and $5,323,039 in 2005. Giving 70% of net operating revenue as bonuses to already highly paid employees is not what one usually thinks of as a charitable purpose; however, one expects doctors to be well compensated. They forego much economic opportunity during their many years of schooling and training. Furthermore, the evidence shows that the Foundation's physicians are paid at about the

national mean. Only 30% of the Foundations net operating revenue is used for what could be called a charitable purpose, a donation to an educational institution.

*Does the Foundation depend on contributions and donations*
*for a substantial portion of its existence?*

Mr. Lind testified that the Foundation is prohibited from accepting contributions or donations by its Initial Affiliation Agreement so it will not compete with EVMS for them. Exhibit 10, section 2(b); transcript, pp. 53-54. This weighs against a finding that the Foundation operates as a charity. *Ola*, 270 Va. at 562, 621 S.E.2d at 76.

*Is the Foundation exempt from federal income tax*
*and/or local real estate tax?*

As noted above, the Foundation is exempt from federal income tax, and, as it owns no facilities, it would not be subject to real estate taxes. Transcript, p. 56.

*Does the Foundation's provision of services take into consideration*
*a person's ability to pay for such services?*

Section II(a) of the Foundation's Restated Articles of Incorporation provides that it is to operate "without regard to ... ability to pay of the patients so served." Exhibit 8. If Mr. Lind wanted to impress any one fact upon me, it was the Foundation's provision of physician services to patients regardless of ability to pay. Transcript, throughout. The Foundation does take ability to pay into account in a favorable way. The cost of its services will be discounted to those of lesser means who have some ability to pay.

*Does the Foundation have any stockholders or others*
*with an equity stake in its capital?*

The Foundation is a non-stock, non-member corporation. Exhibit 8, section IV; transcript, p. 33. Thus, no one has an equity interest in it.

*Are the directors and officers of the foundation
compensated and, if so, on what basis?*

The directors are not compensated. Transcript, p. 36. There was no evidence about the compensation of the officers.

If I were deciding this issue for the first time, I might conclude the Foundation does not operate as a charity. It operates a very large medical practice. A very large part of its revenue comes from insurance payments. A very small part of the value of the services provided is attributable to indigent care. There was no evidence about the number of indigent patients treated compared to the number of paying patients. Nor was there evidence about the amount discounted to patients of limited means. The Foundation receives no contributions or donations from the public. It uses 70% of its net revenue to pay bonuses to physicians. It requires the physicians to sign contracts that contain covenants not to compete.

I share many of the concerns Judge Hogshire expressed in *Morris v. University of Va. Health Services Found.*, Case No. 05-163 (Charlottesville Cir. Ct. October 25, 2006). It seems this Foundation is operated largely for the benefit of paying patients, the physicians, and EVMS. However, there were several facts present in *Morris* that are not present here. The foundation in *Morris* had a reserve fund of $24,000,000; it had investments including real estate and bonds; indigent patients were billed for all services provided; it sued indigent patients for bills; it filed more than 1,000 collection suits a year; there was evidence the foundation was created primarily as a billing system.

However, this Foundation allows EVMS to attract well qualified doctors to teach future doctors. Mr. Lind's testimony persuades me that, without the Foundation, EVMS would not be able to do so. The Foundation thus supports the operation of EVMS. Furthermore, one judge in Portsmouth and two judges of this court have found the Foundation to be a charity. *Moore v. Maryview Medical Center*, 71 Va. Cir. 442 (2005); *Kremen v. Bon-Secours*, At Law No. L01-2959 (Norfolk Cir. Ct. March 29, 2004); *Mullen v. Dattel*, At Law No. L04-1653 (Norfolk Cir. Ct. May 25, 2005), appeal denied, record no. 060031 (Sup. Ct. of Virginia, April 11, 2006), rehearing denied June 16, 2006. Although I am not bound by those decisions, I believe my misgivings about the operation of the Foundation as a charity should yield to stability in the administration of the law. I thus conclude the Foundation operates for a charitable purpose.

*The Plaintiff's Decedent As a Beneficiary of the Foundation*

Unlike the plaintiffs in *Kremen* and *Mullen*, the plaintiff's decedent was covered by insurance. Transcript, pp. 102-11, 128. This does not, however, change the result. "The fact that an organization receives compensation from those who are able to pay for services received does not remove its charitable immunity." *Ola*, 270 Va. at 563, 621 S.E.2d at 76-77. Rather, a beneficiary "receives something of value, which the organization by its charitable purpose, undertakes to provide." 270 Va. at 564, 621 S.E.2d at 77. The plaintiff's decedent was a beneficiary of the Foundation.

I sustain the plea, and, as Mr. Geib, counsel for the plaintiff, has conceded he cannot plead or prove gross negligence, I dismiss the action with prejudice.