# CIRCUIT COURT OF LOUDOUN COUNTY

Mary Lantz

v.

Believers Baptist Church
of Sterling et al.

September 5, 2008

Case No. CL46694

BY JUDGE THOMAS D. HORNE

As a child, Mary Lantz worshipped with the Believers Baptist Church of Sterling and was a student at the Leesburg Christian School located in Loudoun County. The Leesburg Christian School was at that time, and remains to this day, an outreach ministry of the Church.

Ms. Lantz, who is now an adult, alleges that, at the time she attended the Church and School, she was molested on multiple occasions by Jonathan and Joel Overstreet. Jonathan and Joel Overstreet were at that time the teenage sons of Terry and Sharon Overstreet. These alleged acts of sexual assault occurred during the period from 1992 through 1994, when Ms. Lantz was between the ages of five and seven. Terry Overstreet was, and continues to be, the Pastor of the Church. These molestations are alleged to have occurred at the Overstreet home and on the premises of the Believer's Baptist Church and Leesburg Christian School.

Ms. Lantz states in her pleadings that, at the time the molestations occurred, her family was staying with Pastor and Mrs. Overstreet in their home. Defendant Sharon Overstreet is the plaintiff's aunt. In addition to his

pastoral duties with the Church, Mr. Overstreet was the director and pastor of the School. His wife served as an employee and administrator with the School.

Recovery is sought against the Believers Baptist Church, Pastor Overstreet, Church Trustees, Leesburg Christian School, Jonathan Overstreet, Terry Overstreet, Sharon Overstreet, and Joel Overstreet. The complaint states several causes of action sounding in tort, including negligence. In defense and bar of the claims of simple negligence against them, the Believers Baptist Church, Pastor Overstreet, Sharon Overstreet, Bernard Thornton, trustee, Theron Johnson, trustee, Terry Overstreet, trustee, Curtis Snyder, trustee, and the Leesburg Christian School have raised the doctrine of charitable immunity.

It is the contention of the plaintiff, among other things, that the Church, School, Trustees, as well as Terry and Sharon Overstreet negligently failed to protect her from harm while at church and in school, and that as a result of the "special relationship" existing between defendants and plaintiff, the defendants are to be held liable for injury and damages caused by the criminal acts committed upon her by the two male juveniles.

By prior order, the Court has considered and ruled upon various demurrers to the complaint, including the dismissal of the allegations of intentional infliction of emotional distress. The instant Plea in Bar raises the issue of whether these defendants, with the exception of Jonathan and Joel Overstreet, are entitled to claim charitable immunity from acts of negligence giving rise to the injury and damages claimed by plaintiff. In the event the Court sustains the instant Plea, those remaining counts will survive, including claims of gross negligence.

Plaintiff states the question presented as follows.

> [s]hould an organization whose mission and purpose fails to state a non-profit or eleemosynary purpose, which runs itself like a business annually generating a profit, charges tuition to attend its school, ascribes to an aggressive method of debt collection for unpaid tuition, and uses a minuscule portion of its profits for charitable purposes be entitled to charitable immunity to protect it from the tort claim by a minor negligently injured by the organization's agents?

Defendants contest the validity of plaintiff's conclusions and suggest that, in accordance with the doctrine of charitable immunity, they are entitled to assert against the plaintiff, a beneficiary of the Church and School, a bar to claims of negligence (but not those of gross negligence).

The formative document for the Believers Baptist Church of Sterling is the Purpose Statement and Articles of Faith Constitution. The Church is not incorporated. As the raison d'etre for its existence, the Articles of Faith set forth the following:

> The purposes for which this Church was started are:
> A. To practice and promote the doctrines and ethics taught and demonstrated by our Lord Jesus Christ in the New Testament and to teach and preach, through all available media, the gospel of our Lord Jesus Christ in accordance with the mandate of the Great Commission.
> B. To provide for and promote by whatever means necessary and appropriate, the spiritual, mental, and physical growth and health of those who have trusted and accepted the Lord Jesus Christ.

In furtherance of the purposes of the Church, the Articles of Faith then enumerate a series of undertakings that the Church would seek to conduct in pursuit of these generally stated reasons for its existence. These ministries include such things as sponsoring evangelical broadcasts, maintaining orphanages, maintaining retirement homes, establishing medical facilities, operating rehab centers, publishing books and music, and the formation of supper club facilities. While these purposes have yet to be achieved, certain others have. These would include the following:

> 2. [t]o establish and maintain Christian educational facilities for all education-believing that God is the author of all things, that nothing is "secular," and all things spiritual. These facilities will teach, train, and evangelize children from nursery school age to adulthood. This would incorporate Christian daycare centers and Christian day schools. . . .
> 12. [t]o purchase, take, receive, lease, take by gift, will or otherwise, acquire, own, hold, improve, use and otherwise deal in and with, real or personal property, or any interest therein, wherever situated.

In 1989, the Believers Baptist Church, in accordance with its statement of purpose, acquired the Leesburg Christian School, a K-12 private school located on sixteen acres of land. The Mission and Purpose statement for the School describes the School as one that is, "[t]o prepare young people for a

fulfilling life of serving God and others by equipping them academically, socially, emotionally, physically, and spiritually through the use of excellent Christian curriculum taught by godly teachers in a nurturing environment."

The Leesburg Christian School, like its parent the Believers Baptist Church of Sterling, is not incorporated. Moreover, there is a commonality in both the leadership and financial accounting, including payment of expenses out of a common bank account, between the Church and School.

Thus, for purposes of this analysis, the Church and School are seen as one. They are inextricably linked by the formative documents; they share a common campus and facilities; they pay substantially all of their bills from a common account into which receipts, including charitable donations are placed; and they have interrelated leadership.

Plaintiff asserts that, in purpose and in fact, neither the Church nor the School is a charity. Thus, she asserts, in her papers and in oral argument, that, when measured against the relevant factors to be applied by a trial court in determining the applicability of charitable immunity in Virginia, both organizations fail to meet the requirements established by the Supreme Court of Virginia. *Ola v. YMCA of S. Hampton Roads, Inc.*, 270 Va. 550 (2005); *UVA Health Services Foundation v. Morris*, 275 Va. 319 (2008). In addition, counsel for the plaintiff lay down a legal broadside to the viability of the doctrine of charitable immunity in Virginia. While such arguments have led to the abrogation of the doctrine in most states, it is not for this Court to do so in light of Supreme Court precedent to the contrary.

Thus, the Court must apply a factor-based test to the evidence in this case when disposing of the defendants' claims of charitable immunity.

*Factor 1: Does the organization's charter set forth a charitable or eleemosynary purpose?*

The formative documents of the Church set forth a myriad of ways that it seeks to further the purposes for which the Church was created. Charities are not limited to almsgiving. See, *Ola v. YMCA of S. Hampton Roads, Inc.*, 270 Va. 550 (2005). In general, the concept of charity evokes ideas of need and gratuitous benefits bestowed or gifted in response to that need. Although moral and religious guidance are more ethereal concepts of philanthropic activity than providing food and shelter, they nevertheless are recognized as similar objects of charity.

In the instant case, the needs identified are addressed within the context both of faith and theology. These formative documents represent a desire to propagate ideas as well as to create institutions that both further those ideas as

well as address mental, physical, emotional, and educational needs of those who are willing to listen to, or accept, what is offered. The formative documents, while they speak in words of faith, state a charitable or eleemosynary purpose sufficient to raise a rebuttable presumption that the Church and the School are charitable organizations.

Thus, in determining the organizational nature of the Church and School, the Court must examine a number of discrete factors to determine whether these defendants are immune from tort liability based upon the doctrine of charitable immunity. In so doing, the Court is asked to closely scrutinize the finances of the Church and School. More particularly, the plaintiff suggests that the bookkeeping of both organizations is inaccurate, misleading, and designed to make the Church and School's finances the "private piggybank" for Mr. and Mrs. Overstreet and their family members. Thus, counsel suggest, neither the Church nor the School is a charity in fact.

The bookkeeping for the Church and School is suspect. In the case of reported "loans to teachers" the bookkeeping masks delinquent payments of payroll taxes and is deceptive. Nevertheless, the evidence does not rise to the level of overcoming the presumption that is afforded defendants from a reading of the organizational documents. Bad bookkeeping, while a factor to be considered, does not preclude the defendants from the pursuit of their claimed immunity. It is the manner in which the organizations conduct their affairs that controls.

*Factor 2: Do the organizational documents limit the entity to a charitable or eleemosynary purpose?*

Whether a church is a charity does not depend upon its failure to organize and establish itself under Section 501(c)(3) of the Internal Revenue Code. In the instant case, the purposes are defined by the nature of the organizations as religious in nature, both as a church and as a faith-based mission of the church. The dissemination of differing religious ideas and moral codes is part of the fabric of our society, protected in its free exercise by the Constitution.

Nothing in the organizational documents suggests that either the Church or the School is organized for commercial purposes or the financial gain of individuals. While the financial documents reflect a handling of finances by the Overstreet family in ways similar to a small business model, they do not undermine the fundamental fabric of these organizations as operating in a not-for-profit way, in which they are dependent both on loans and gifts by others.

*Factor 3: Does the entity's charter contain a not-for-profit limitation?*

As previously noted, the instant organizational documents are for a religious organization and an outreach program for a school inextricably intertwined with that ministry. Whether the organization is the recipient of Section 501(c)(3) status is of little importance to the inquiry.

*Factor 4: Does the entity in fact earn a profit, and if so, how often does it occur?*

While the School has earned a profit, such profits are not necessarily expected or anticipated. The fact that the property, upon the dissolution of the Church, may devolve to those who are closely aligned to its leadership is, in the opinion of the Court, a matter of speculation. The provisions of law and a vote of the congregation guide dissolution. Va. Code Ann. § 57-9.

*Factor 5: If the entity earns a profit (a surplus beyond expenses) must that be used for a charitable purpose?*

The organizational documents lay out a roadmap as to how money is to be spent, including any surplus that may result from the operation of the School and Church. Neither the existence of a profit nor the passive gain attributable to real estate owned by the Church, and used by both Church and School, is determinative of the issue. There is nothing in the Articles of Faith and Constitution for the Church that would permit profits to be distributed other than for the improvement of facilities and the payment of overhead and expenses of operations. No evidence has been introduced that this is a commercial venture.

It has been observed that:

> [P]rudence and the exercise of fiduciary responsibility fully justify a nonprofit organization accumulating a surplus, provided it continues to invest in the organization's charitable purpose or otherwise expends the surplus for a charitable purpose. Indeed, a charitable institution's inability to sometimes post a surplus may doom its existence and end its work of charity when nonsurplus years arrive.

*Ola v. YMCA of S. Hampton Roads, Inc.*, 270 Va. 550, 562 (2005).

Thus, the existence of a surplus in the operation of the School is not determinative.

*Factor 6: Does the entity depend on contributions and donations for a substantial portion of its existence?*

As counsel for the defendants has observed, the Supreme Court found that a YMCA was entitled to claim charitable immunity when 29% of its income came from public donations. *Ola v. YMCA of S. Hampton Roads, Inc.*, 270 Va. 550 (2005). In the instant case, the testimony suggests that 27% of the income of the Church is derived from donations. Scholarships are available for students unable to afford tuition. Like the YMCA in *Ola*, a significant portion of the mission of the Believers Baptist Church, that includes the operation of the Leesburg Christian School, is supported by donations in addition to tuition.

*Factor 7: Is the entity exempt from federal income tax and/or local real estate tax?*

The Church and School would not be subject to tax.

*Factor 8: Does the entity's provision of services take into consideration a person's ability to pay for such services?*

Neither membership in the Church nor participation in its outreach ministry is dependent upon payment of a fee. Scholarship assistance is provided for students at the School and programs provided through the Church that are eleemosynary in nature.

*Factor 9: Does the entity have stockholders or others with an equity stake in its capital?*

Church Trustees hold the real estate of the Church in accordance with the laws of Virginia. As trustees, they act in accordance with the directives of the congregation of the Church. Va. Code Ann. §§ 57-8, 57-10. Although the Trustees may sue to recover property held in trust, they hold no equity interests in the assets of the Church or School. Va. Code Ann. § 57-11.

*Factor 10: Are the directors and officers of the entity compensated and, if so, on what basis?*

The Trustees of the Church serve without compensation. Payment is made only to employees and contractors with the Church.

While the factors set forth above are not exhaustive, they are determinative of the issue of the Plea in this case. Plaintiff has demonstrated that the accounting methods utilized by the Church and School are not in accordance with General Accepted Accounting Principles and are misleading. However, both, in purpose and in practice, the operation of the Church and School are a charity subject to immunity from suit in actions for simple negligence brought by those who are the beneficiaries of the charity.

Plaintiff, as a student at the School and worshipper at the Church, was such a beneficiary.

The School charges a fee of $25.00 per month for late tuition payments. It withholds report cards and threatens reference of delinquent accounts to a lawyer for collection. These methods can hardly be said to be aggressive debt collection. Cf. *UVA Health Services Foundation v. Morris*, 275 Va. 319, 336 (2008).

While neither the Church nor School have a formal corporate structure, the facts demonstrate that they have and continue to pursue the charitable purposes outlined in their formative documents. The Church seeks to further its goal of disseminating a religious-based value system to those who are willing to listen. The School incorporates those ideas into a curriculum geared to provide an education to children.

No commercial activity has been identified in the operation of either Church or School. The Pastor and his wife have loaned money to the Church. The circumstances under which the loans have been made, credits to the lenders, and the method of repayment call into question the bookkeeping of the Church, but do not render them something other than loans for which members seek repayment. Although the loan ledger is kept "off the books" and may be deceptive to those reading a balance sheet, the Court cannot conclude that they are either fabricated or overstated. These loans do not evidence a scheme to "use the Church as their private piggy bank."

The record does not support a conclusion, other than the defendants, without cost, seek through the Church to expose others to a moral and ethical code tempered by their religious beliefs. In furthering that belief system and aided substantially by the largess of others' giving, they have created an educational institution suited to meet the educational needs of young persons.

Other programs of the Church include such things as helping people out of gas, interacting with the homeless shelter across the road, giving clothes to those in need, collecting food baskets for needy families, providing scholarships, providing free meals to the public on Wednesday evenings, helping people with housing expenses, and sponsoring mission projects. In summary, both in word and in action, the Church and its outreach mission of the School are a charity within the contemplation of Virginia law.

The Plea of Charitable Immunity will be sustained.